

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION – CIVIL ACTIONS BRANCH**
**500 INDIANA AVENUE NW, Room 5000**
**WASHINGTON, DC 20001**

Date:   **08/31/2023**

The Honorable Angela Caesar, Clerk
United States District Court for the District of Columbia
3rd and Constitution Avenue, Washington, D.C. 20001

In Re:                          **Anthony C Hill v. Workday, Inc.**

Civil Action Number:  **2023-CAB-004502**

U.S. District Number:  **N/A**

Dear Ms. Angela Caesar:

        Transmitted herewith are all of the pleadings filed in the above captioned case pursuant to a Petition for Removal Filed in the District of Columbia Superior Court on **08/17/2023** . A certified copy of the docket entries is also enclosed.

        Please acknowledge receipt of our file on a duplicate copy of this letter, and return it to this Court.

                                Sincerely,


                                Joy Jefferson, Branch Chief
                                Civil Actions Branch

                Completed By:  Antonia Taylor

CASE SUMMARY

# CASE SUMMARY
## CASE NO. 2023-CAB-004502

Anthony C Hill v. Workday, Inc.

§
§
§
§
§

Location: **Civil Actions**
Judicial Officer: **Lee, Milton C**
Filed on: **07/24/2023**

---

## CASE INFORMATION

**Statistical Closures**
08/31/2023   Notice of Removal to USDC
08/18/2023   Notice of Removal to USDC

Case Type: **Employment Dispute**
Subtype: **Discrimination**

Case
Status: **08/31/2023   Closed**

---

| DATE | CASE ASSIGNMENT | |
|---|---|---|

**Current Case Assignment**
Case Number          2023-CAB-004502
Court                     Civil Actions
Date Assigned        07/24/2023
Judicial Officer       Lee, Milton C

A TRUE TEST COPY

Clerk, Superior Court of
the District of Columbia

By:   A. Taylor
**Deputy Clerk**

Date:   August 31, 2023

---

## PARTY INFORMATION

*Attorneys*

**Plaintiff**          **Hill, Anthony C**

**Brown Gaines, Eden J**
*Retained*
202-803-8718(W)

**Defendant**          **Workday, Inc.**

---

| DATE | EVENTS & ORDERS OF THE COURT |
|---|---|

### EVENTS

08/31/2023   Case Closed. Notice of Removal. Notices Mailed

08/31/2023   Notice of Removal Processed and Forwarded to USDC

08/17/2023   Notice of Removal to US District Court
Docketed on: 08/18/2023
Party: Defendant  Workday, Inc.

08/14/2023   Motion to Admit Attorney Pro Hac Vice Filed
*Motion for Admission Pro Hac Vice*
Docketed on: 08/15/2023
Filed by:  Plaintiff  Hill, Anthony C

08/14/2023   Affidavit/Declaration of Service of Summons and Complaint
Docketed On: 08/14/2023
Filed By:  Plaintiff  Hill, Anthony C
Served On:  Defendant  Workday, Inc.

07/25/2023   Notice

07/25/2023   Initial Order [Remote] (Judicial Officer: Lee, Milton C )

07/24/2023   Complaint Filed
Docketed on: 07/25/2023
Filed by:  Plaintiff  Hill, Anthony C

### HEARINGS

10/27/2023   *CANCELED* **Remote Initial Scheduling Conference** (9:30 AM)  (Judicial Officer: Lee,

CASE SUMMARY

# CASE SUMMARY
## CASE NO. 2023-CAB-004502

Milton C ;Location: Courtroom 318)
*Case Certified and/or Transferred*

| DATE | FINANCIAL INFORMATION |
|------|----------------------|

**Plaintiff** Hill, Anthony C

| | |
|---|---|
| Total Charges | 140.00 |
| Total Payments and Credits | 140.00 |
| **Balance Due as of 08/31/2023** | **0.00** |

*Printed on 08/31/2023 at 3:48 PM*

eFiled
08/17/2023 2:32:55 PM
Superior Court
of the District of Columbia

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA CIVIL DIVISION

| | |
|---|---|
| **ANTHONY C. HILL,**<br>c/o Winston Cooks LLC<br>420 20th Street N, #815<br>Birmingham, AL 35205<br><br>        **Plaintiff,**<br><br>**v.**<br><br>**WORKDAY, INC.,**<br>6110 Stoneridge Mall Road,<br>Pleasanton, CA 94588<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Case No. No. 2023-CAB-004502**
**Hon. Milton C. Lee**
**Next Event: Initial Scheduling**
**Conference – 10/27/2023 – 9:30am**

## NOTICE OF FILING OF NOTICE OF REMOVAL

To:    Clerk of the Court – Civil Division
        Superior Court for the District of Columbia

PLEASE TAKE NOTICE that Defendant, Workday, Inc. ("Workday"), has this date

removed the above captioned action from the Superior Court for the District of Columbia, in

which it was originally filed, to the United States District Court for the District of Columbia.

Attached hereto as **Exhibit A**, and made part hereof, is a copy of the Notice of Removal (without

exhibits) which has been filed in the United States District Court for the District of Columbia.

I

Pursuant to 28 U.S.C. § 1446(d), this Court shall proceed no further.

Dated: August 17, 2023                Respectfully Submitted,

                                      ORRICK, HERRINGTON & SUTCLIFFE LLP

                                      */s/ Diana Szego Fassbender*
                                      Diana Szego Fassbender (# 996625)
                                      Orrick, Herrington & Sutcliffe LLP
                                      Columbia Center, 1152 15th Street, N.W.
                                      Washington, D.C. 20005
                                      Telephone: (202) 339-8400
                                      Facsimile: (202) 339-8500
                                      dszego@orrick.com
                                      *Counsel for Defendant Workday, Inc.*

2

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of August 2023, a copy of the foregoing

*Notice of Filing of Notice of Removal* was mailed and e-filed and served via U.S. Mail

upon:

Eden Brown Gaines
*Counsel for Plaintiff*
800 Main Avenue SW, Suite 200
Washington, DC 20024

Dated: August 17, 2023            Respectfully Submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Diana Szego Fassbender*
Diana Szego Fassbender (# 996625)
Orrick, Herrington & Sutcliffe LLP
Columbia Center, 1152 15th Street, N.W.
Washington, D.C. 20005
Telephone: (202) 339-8400
Facsimile: (202) 339-8500
dszego@orrick.com
*Counsel for Defendant Workday, Inc.*

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

ANTHONY C. HILL,                              )
c/o Winston Cooks LLC                         )
420 20th Street N, #815                       )
Birmingham, AL 35205                          )
                                              )   Case No. 1:23-cv-2396
              Plaintiff,                       )   Formerly Case No. 2023-CAB-004502
                                              )   Hon. Milton C. Lee
v.                                            )   Superior Court for the District of
                                              )   Columbia
WORKDAY, INC.,                                )
6110 Stoneridge Mall Road,                    )
Pleasanton, CA 94588                          )
                                              )
              Defendant.                       )

## NOTICE OF REMOVAL

Defendant, Workday, Inc. ("Workday"), by and through its undersigned attorneys, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, hereby removes the above-captioned matter to this Court. The grounds for removal are set forth below.

### Nature of Plaintiff's Claim

1.      On July 24, 2023, Plaintiff Anthony C. Hill ("Plaintiff") through counsel, filed the above action against Workday in the Civil Division of the Superior Court for the District of Columbia, Case No. 2023-CAB-004502. In accordance with 28 U.S.C. § 1446(a), true and accurate copies of all process, pleadings, and orders served in the Superior Court for the District of Columbia as of this date are attached hereto as described further herein.

2.      Plaintiff's Complaint alleges claims against his employer, Workday, arising out of his employment including: race and disability discrimination in violation of the D.C. Human Rights Act ("DCHRA"), hostile work environment in violation of the DCHRA, unlawful retaliation in violation of the DCHRA, failure to engage in the interactive process in violation of the DCHRA, interference with family & medical leave in violation of the D.C. Family &

Medical Leave Act, intentional infliction of emotional distress, and negligent hiring, supervision and retention. Plaintiff's Complaint is attached hereto as **Exhibit A.**

### Procedural Posture

3.      This action was initiated by Plaintiff on July 24, 2023.

4.      Plaintiff served his Complaint on Workday via certified mail on July 25, 2023. Service was effected on Workday's agent for service of process on July 27, 2023. A copy of the materials served upon Workday is attached hereto as **Exhibit B**. Attached as **Exhibit C** is a copy of Plaintiff's Civil Actions Branch Information Sheet, which was filed on July 24, 2023, and appears on the Superior Court docket but was not served on Workday. **Exhibit D** includes any remaining documents that currently appear on the Superior Court docket and are not otherwise attached hereto.

5.      The Notice of Removal of this case to the United States District Court is being timely filed by Workday, pursuant to 28 U.S.C. § 1446(b)(2)(B), as it is filed within 30 days of the date upon which Plaintiff served Workday.

### Jurisdiction and Venue

6.      This Court has original jurisdiction of this civil action under 28 U.S.C. § 1332(a) (diversity of citizenship), and accordingly it is removable pursuant to 28 U.S.C. § 1441.

7.      Section 1332(a) states that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States[.]" 28 U.S.C. § 1332(a).

8.      According to the Complaint, Plaintiff resides in Silver Spring, MD. *See* **Exhibit A**, Compl., ¶ 88. A party's citizenship "depends upon domicile." *Lopes v. Jetsetdc, LLC*, 4 F.Supp.3d 238, 241 (D.D.C. 2014). "A person's domicile is determined by two factors: (1)

2

physical presence in a state; and (2) an intent to remain there for an indefinite period of time." *Id.*
Plaintiff has owned his home in Maryland for "over 15 years." **Exhibit A**, Compl. ¶ 105.
Accordingly, Plaintiff is a citizen of Maryland. *See Lopes*, 4 F.Supp.3d at 241 (acknowledging
home ownership as indicia of domiciliary status).

9.     Workday is a Delaware corporation with its principal place of business in
Pleasanton, California. *See* **Exhibit E**, Declaration of Ruth Bolden. Accordingly, it is a citizen of
Delaware and California for purposes of diversity jurisdiction. *See* 28 U.S.C. § 1332(c)(1);
*Lincoln Property Co. v. Roche*, 546 U.S. 81, 94 (2005) (jurisdictional rule that corporation is a
citizen of any state in which it has been incorporated and the state where it has its principal place
of business is unambiguous).

10.     There are no other defendants or third parties in this action.  Accordingly, there is
complete diversity of citizenship.

11.     A plaintiff cannot avoid removal by failing to specifically allege that damages
exceed $75,000. *McPhail v. Deere & Co.*, 529 F.3d 947, 955 (10th Cir. 2008). Instead, where a
complaint does not expressly allege the amount in controversy, a defendant seeking removal
"may rely on an estimate of the potential damages from the allegations in the complaint" and/or
"other documentation [that] can provide the basis for determining the amount in controversy."
*Id.* at 955-56. Here, Plaintiff seeks to recover for "loss of wages, loss of benefits, mental anguish,
emotional distress, personal humiliation, indignity, embarrassment, inconvenience, stigma, pain
and suffering, and damages to his personal and professional reputations, justifying an award
including but not limited to damages for emotional distress, compensatory, punitive and
consequential damages" as well as attorneys' fees. **Exhibit A**, Compl., ¶ 189; *see Lewis v.
Verizon Comm., Inc.*, 627 F.3d 395, 400 (9th Cir. 2010) ("[T]he amount in controversy is simply

an estimate of the total amount in dispute, not a prospective assessment of defendant's liability."). Given the sweeping discrimination, retaliation, and emotional distress that Plaintiff alleges, including a request for punitive damages, it could hardly be disputed that his claim meets the jurisdictional threshold. Indeed, in filing his claim with the Superior Court, Plaintiff indicated a demand of $1,000,000, far in excess of the $75,000 jurisdictional threshold. *See* **Exhibit C**.

13.     Because this action is between citizens of different states and the amount in controversy exceeds $75,000, this Court has original jurisdiction pursuant to 28 U.S.C. §§ 1332(a), 1441(a) and 1446(a).

13.     Pursuant to 28 U.S.C. § 1441, venue is made proper in this district upon removal because this district embraces the Superior Court of the District of Columbia, the jurisdiction in which Plaintiff initiated his lawsuit. 28 U.S.C. § 1441(f).

14.     Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being filed contemporaneously with the Clerk of the Superior Court of the District of Columbia and served along with written notice on Plaintiff's counsel of record. A copy of the Notice to the Clerk of Removal is attached hereto as **Exhibit F**.

15.     No admission of fact, law or liability is intended by this Notice of Removal, and all defenses, affirmative defenses and motion are hereby reserved to Workday.

WHEREFORE, Workday, hereby removes the above-captioned action, which is currently

pending in the Superior Court for the District of Columbia.

Dated:   August 17, 2023                 Respectfully Submitted,

                                         ORRICK, HERRINGTON & SUTCLIFFE LLP

                                         */s/ Diana Szego Fassbender*
                                         Diana Szego Fassbender (# 996625)
                                         Orrick, Herrington & Sutcliffe LLP
                                         Columbia Center, 1152 15th Street, N.W.
                                         Washington, D.C. 20005
                                         Telephone: (202) 339-8400
                                         Facsimile: (202) 339-8500
                                         dszego@orrick.com
                                         *Counsel for Defendant Workday, Inc.*

5

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of August 2023, a copy of the foregoing *Notice of Removal* was mailed and e-filed and served via U.S. Mail upon:

Eden Brown Gaines
*Counsel for Plaintiff*
800 Main Avenue SW, Suite 200
Washington, DC 20024

Dated: August 17, 2023

Respectfully Submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Diana Szego Fassbender*
Diana Szego Fassbender (# 996625)
Orrick, Herrington & Sutcliffe LLP
Columbia Center, 1152 15th Street, N.W.
Washington, D.C. 20005
Telephone: (202) 339-8400
Facsimile: (202) 339-8500
dszego@orrick.com
*Counsel for Defendant Workday, Inc.*

6

eFiled
07/24/2023 5:23:22 PM
Superior Court
of the District of Columbia

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

|  |  |
|---|---|
| Anthony C. Hill, | ) |
| *Plaintiff* | ) ) ) ) |
| v. | ) ) ) |
| Workday, Inc. | ) Case Number:  2023-CAB-004502 |
| *Defendant* | ) ) JURY TRIAL REQUESTED |

**COMPLAINT FOR DECLARATORY JUDGMENT,**
**INJUNCTIVE RELIEF, AND MONETARY DAMAGES**

Plaintiff, Anthony C. Hill ("Hill" or "Plaintiff"), by and through his counsel, files this Complaint

against his employer, Workday, Inc. ("Workday" or "Defendant"), alleging as follows:

**INTRODUCTION**

1.      Plaintiff brings this action pursuant to the D.C. Human Rights Act, DC Code § 2-

1401.01, *et seq*. ("DCHRA")[1] and the D.C. Family & Medical Leave Act, D.C. Code § 32-510(b) ("D.C.

FMLA")[2] for redress of injuries suffered due to a long-standing and pervasive practice of discrimination

on the basis of race and disability; the creation of a hostile work environment; interference with Family &

Medical Leave; and retaliation for opposing and reporting such unlawful employment practices.  Plaintiff

---

[1] The remedies under the DCHRA are governed by its private cause of action provision, which allows for this Court
to "grant any relief it deems appropriate, including the relief provided in §§ 2-1403.07 and 2-1403.13(a)."  D.C.
Code § 2-1403.16(b).  Section 2-1403.07 provides for injunctive relief.  The DCHRA does not have any statutory
damages caps.

[2] All U.S. employers, including employers in the District of Columbia, must comply with the federal Family and
Medical Leave Act, which allows eligible employees to take unpaid leave, with the right to reinstatement, to attend
to certain health and family matters, as does the D.C. FMLA.  *See, e.g.*,
https://docs.dc.gov/sites/default/files/dc/sites/docs/publication/attachments/PFL%20Employee%20FAQ_0.pdf.

also brings claims for negligent hiring, supervision, and retention, as well as intentional infliction of emotional distress pursuant to D.C. common law.

**PARTIES**

2.     Plaintiff is a black male with disabilities, some of which result in his suffering from cognitive and memory challenges.  Plaintiff has been practicing law as an attorney for approximately 20 years dealing almost exclusively with regulatory and compliance matters.

3.     Plaintiff is a 2004 graduate of the Howard University School of Law.[3]  Upon graduating law school, Plaintiff worked for one year as a judicial law clerk to the Chief Judge of D.C.'s highest court (equivalent of a state supreme court), the D.C. Court of Appeals[4], and then he worked for two years as a judicial law clerk to a judge on the U.S. District Court for the District of Columbia. (Plaintiff also interned for judges on the D.C. Court of Appeals and the U.S. District Court for the District of Columbia while in law school.)

4.     Immediately after clerking, Plaintiff worked as an Associate for three years and then was promoted to Counsel, a role he served in for two years, at the "white shoe" international law firm Akin Gump Strauss Hauer & Feld LLP.  Following his time in private practice, Plaintiff served as General Counsel of Financial Markets International Inc. ("FMI"), a former client of Akin Gump's, for two years. Plaintiff then worked for six years as in-house counsel for Accenture Federal Services ("AFS"), which is the federal subsidiary of Accenture LLP, one of the largest consulting firms in the world by revenue and size.

---

[3] Wayne A.I. Frederick, M.D., Howard University's immediate past President, is currently a member of Workday's Board of Directors.  *See* https://newsroom.workday.com/2022-06-22-Workday-Elects-Wayne-A-I-Frederick,-M-D-to-Board-of-Directors.  Like Plaintiff, Mr. Frederick completed both his undergraduate and advanced (professional) degrees at Howard University.

[4] *See* https://www.dccourts.gov/court-of-appeals.

5.      Plaintiff's current employer[5], Workday, is a *Fortune* 500, multinational cloud software corporation with more than 55 office locations in the U.S., Canada, Mexico, Europe, Africa, and Asia Pacific.[6] Workday makes billions of dollars annually in revenue and counts more than half of all *Fortune* 500 companies as current clients, according to *Forbes*.[7]

6.      In 2021, Workday boosted its brand ID by signing Naomi Osaka, a global sports icon who "is of Japanese, Haitian, and American heritage," and who had been ranked No. 1 in the world by the Women's Tennis Association, to be a "Workday Brand Ambassador."[8]

7.      Workday stated as the basis for its branding partnership with Ms. Osaka, who famously uses her platform to promote social justice and racial equity, that both Workday and Ms. Osaka share "Core Values" and a commitment to "doing the right thing to support the greater good…."

8.      In 2022, Workday produced a Super Bowl ad featuring famous rock & roll musicians Billy Idol, Ozzy Osbourne, Joan Jett, Paul Stanley, and Gary Clark Jr., in addition to a cast of actors playing uncharacteristically diverse Workday employees who were dubbed the real "rockstars."[9]

9.      Despite its funny Super Bowl commercial, which Mr. Idol called "a bit of an exaggeration" to *People.com*, Workday employs more than 12,500 people worldwide; less than 2.5% of whom are black.

10.      Key ingredients of Workday's brand and ultimate success are diversity, ethics, and compliance. The company proudly proclaims, for example, that for three years in a row it has been

---

[5] Plaintiff accepted a job offer from Workday on December 15, 2020 and began working for the company in early 2021.

[6] *See* https://www.workday.com/en-us/company/about-workday/contact-us.html.

[7] *See* https://www.forbes.com/sites/ryancraig/2023/06/12/the-talent-gap-in-the-workday-ecosystem/?sh=6d6572917375.

[8] *See* https://blog.workday.com/en-us/2021/workday-welcomes-naomi-osaka-newest-brand-ambassador.html.

[9] *See* https://people.com/music/super-bowl-2023-billy-idol-admits-to-fair-share-of-rebellious-antics-ahead-workday-ad/.

named one of "The World's Most Ethical Companies" by Ethisphere Institute, an honor purportedly "based on our culture, environmental and social practices, ethics and compliance activities, governance, diversity, and initiatives to support a strong value chain."[10]

11.     However, during a 2020 company-wide Forum focusing on racial issues closely following public "protests over police brutality against Black Americans," Aneel Bhusri (Indian American male)[11], Workday's co-founder and current co-CEO, admitted that Workday had a "Black diversity problem" stemming from the fact that less than 3% of its workforce was black.[12]

## FACTUAL SUMMARY

### Plaintiff's Protected Activity of Submitting a "Career Growth and Continued Success" Plan to Ms. Hauck

12.     During the first week in May 2021, Plaintiff developed and shared by email with his direct supervisor, Senior Director Katie Hauck (white female), a 10-page "Career Growth and Continued Success Plan" for him to be promoted from Senior Counsel to Assistant General Counsel based on his experience and vastly expanding role.

13.     Ms. Hauck responded to Plaintiff during their next weekly one-on-one meeting that he would need "at least one year" as Senior Counsel.

14.     When Plaintiff reminded Ms. Hauck during that one-on-one meeting about the assertion by Workday's General Counsel and Head of Workday's Legal Compliance & Corporate Affairs ("LCCA") Team, Rich Sauer (white male) within his April 23, 2021 "TGIF" Newsletter that the LCCA Team had made a number of "off-cycle promotions" based on "changed circumstances… compel[ling] us to

---

[10] See https://www.workday.com/en-us/company/about-workday/ethics-compliance.html#:~:text=In%202023%2C%20Ethisphere%20named%20Workday%20an%20honoree%20of,and%20initiatives%20to%20support%20a%20strong%20value%20chain.

[11] See https://economictimes.indiatimes.com/news/company/corporate-trends/meet-the-seven-indian-americans-in-forbes-list-of-richest-people-in-the-world/aneel-bhusri/slideshow/78054939.cms .

[12] See https://www.techtarget.com/searchhrsoftware/news/252485468/Workday-admits-to-Black-diversity-problem-pledges-to-improve.

[promote certain Workday employees] sooner rather than waiting for May [2021,]" Ms. Hauck admitted

that Plaintiff had the requisite professional legal experience, and that his role and responsibilities as

Senior Counsel had been greatly expanded by Workday (which continues presently) sufficiently to justify

his promotion.  Nonetheless, Ms. Hauck was unspecific and evasive about what other criteria Plaintiff

needed for a promotion.

15.     Ms. Hauck then complimented Plaintiff's "Career Growth and Continued Success Plan"

document and told him she would give it to one of her other direct reports, a white female, to use.

Workday promoted this white female from Senior Counsel to Assistant General Counsel shortly

thereafter.

### Workday's Clustering of Blacks at the Bottom of Ms. Hauck's Group

16.     Ms. Hauck hired three lawyers as full-time employees after Plaintiff: an Indian American

woman (Assistant General Counsel), a white man (Assistant General Counsel), and a white woman

(Director, Associate General Counsel).

17.     The three Assistant General Counsel on Ms. Hauck's team have less professional legal

experience than Plaintiff, and none of Ms. Hauck's direct reports have as much supervisory responsibility

as he has, nor do they work with as many teams within the company as Plaintiff does.

18.     Plaintiff also has more professional legal experience than Ms. Hauck.

19.     Plaintiff and the only other black lawyer who reports to Ms. Hauck are at the lower

Senior Counsel position.  The lone paralegal who reports to Ms. Hauck is also black.

### Workday's Hiring of Ms. Strelow and Plaintiff's Protected
### Activity of Working with and Supervising Ms. Strelow

20.     In or around May 2021, Plaintiff asked Ms. Hauck if she would hire a person who would

report to him and aid with creating and supporting Workday's U.S. federal and other public sector

compliance programs.  Ms. Hauck said that she did not have funding for such a role.

21.     However, Christine ("Chris") Fedrow (white female), who leads Workday's Integrity

Team ("WIT"), informed Plaintiff that WIT had funding for the role.[13]

22.    Plaintiff drafted and provided the position description to Ms. Fedrow; was asked and offered his opinion to Ms. Fedrow concerning an appropriate salary and deferred stock grant for the position; participated extensively in the interview process; and served as the "deciding vote" when Ms. Fedrow asked him to choose between the interviewee finalist whom Plaintiff had originally recommended for the role and Christina Strelow (white female), whom Workday ultimately hired as the Program Manager for Federal Ethics & Compliance in or about June 2021.

23.    Since Plaintiff was serving as Ms. Strelow's de facto manager/supervisor, at Ms. Fedrow's request Plaintiff also offered feedback (deservedly glowing) during Ms. Strelow's first performance review period in her role.

24.    Plaintiff and Ms. Strelow have worked tirelessly to create Workday's U.S. federal and other public sector compliance programs.[14]

### *Plaintiff's Protected Activity of*
### *Advocating on Behalf of Ms. Brown*

25.    In October 2021, a black woman, Ashley Brown, MBA, who worked for Workday's Finance Team was having problems with her manager which Ms. Brown stated were based on race, and she reached out to Plaintiff for help.  Ms. Brown asked Plaintiff if he thought she might be a suitable candidate for an open, interim, non-attorney contracting role reporting to Ms. Hauck.

---

[13] Ms. Fedrow currently serves as Workday's Chief Integrity and Compliance Officer and reports to Mr. Sauer, who is at the C-Suite level and reports to Workday's President of the Americas, co-CEOs, and Board of Directors.

[14] Specifically, Plaintiff and Ms. Strelow partner to form the U.S. federal and public sector compliance team. They both run the U.S. federal compliance email alias federalcompliance@workday.com.  Plaintiff and Ms. Strelow also created and maintain the Workday Federal Code of Business Ethics, Workday's U.S. federal policies, Workday's internal U.S. federal compliance "Workspace" page, Workday's myriad U.S. federal compliance trainings, Workday's U.S. federal and public-sector compliance reviews including "Revolving Door" reviews, Organizational Conflicts of Interest reviews, Gifts & Entertainment reviews, U.S. federal marketing materials and marketing events reviews, and the Workday Internal Audit Team's U.S. federal escalation process per the U.S. federal mandatory disclosure rule.  Plaintiff and Ms. Strelow also draft and publish Workday's monthly U.S. federal compliance newsletter, "What's Now and What's Next in U.S. Government Contracting," in addition to other legal compliance efforts.

26.     Plaintiff knew Ms. Brown as a hard worker and pleasant person from many of the U.S. federal compliance meetings he had hosted which Ms. Brown joined on behalf of the Finance Team. Plaintiff also saw in Ms. Brown's resume that she had extensive, relevant professional U.S. federal contracting experience.

27.     On this basis and at Ms. Brown's request, Plaintiff contacted Ms. Hauck and **confidentially** told her Ms. Brown believed she was having problems with her manager because of her race. Following this conversation with Ms. Hauck, Plaintiff shared Ms. Brown's resume with Ms. Hauck (and one of Ms. Hauck's other direct reports), inquiring whether Ms. Brown might be interviewed for the open, interim, non-attorney contracting role.

28.     Ms. Hauck did not respond to Plaintiff's request by email.  However, Ms. Hauck revealed during their next weekly one-on-one meeting that she had spoken with the Finance Team manager about Ms. Brown and based on that conversation alone (which did not even include Ms. Brown), Ms. Hauck decided that Ms. Brown "would not be a good fit."  On this basis, Ms. Hauck refused to interview Ms. Brown for the open, interim, non-attorney contracting role.

29.     Upon information and belief, Ms. Brown's employment with Workday ended shortly thereafter.

### Plaintiff's Protected Activity of Advocating
### for Himself to Mr. Sauer, Which Mr. Sauer Ignored

30.     During the first week of January 2022, with Ms. Hauck's approval, Plaintiff met with Mr. Sauer, Workday's Chief Legal Officer, and told him during a Zoom conference call that because of Workday's many legal compliance obligations under U.S. federal, state, and local laws, it would be advisable for Workday to have an attorney as a  legal subject matter expert for general oversight and specific internal monitoring.  Consequently, Plaintiff recommended to Mr. Sauer that Workday should create the role of "Lead or Head Public-Sector Compliance Counsel" as soon as reasonably possible.

31.     Plaintiff also told Mr. Sauer during that meeting, which Ms. Hauck attended, that he (Plaintiff) would be the ideal candidate to fill the role based on his extensive legal professional

7

experience, supervision of Ms. Strelow, cross-functional responsibilities within Workday, continually expanding role and responsibilities, and subject matter expertise.

32.     Mr. Sauer was receptive to Plaintiff's ideas and asked him to provide him (Mr. Sauer) with a formal written document proposing his (Plaintiff's) promotion to "Lead or Head Public-Sector Compliance Counsel," which he provided to Mr. Sauer via email on January 7, 2022.  However, Mr. Sauer did not respond to Plaintiff.

33.     Months later, Plaintiff emailed Mr. Sauer and expressed his desire to be included in the Leadership Council on Legal Diversity ("LCLD") Fellows Program.[15]  Despite Mr. Sauer's stated "commitment" to, among other things, "model inclusive behaviors, act when confronted with injustice, and foster a safe and brave space for all,"[16] once again Mr. Sauer did not respond to Plaintiff.

### Ms. Hauck's Intimidation, Bullying, Abuse and Harassment of Plaintiff Concerning Rising Orlando 2022, Which Workday Ignored

34.     In August 2022, Workday was preparing to host the U.S.-based exposition of its global biannual marketing event called "Rising" in Orlando, Florida, which occurred from September 12, 2022 through September 15, 2022 (hereafter "Rising Orlando 2022").

35.     Members of Workday's LCCA Team including Plaintiff, Vice President & Head of Corporate Affairs Chandler Morse, Senior Public Policy Manager Matt Pincus[17], Ms. Hauck, and others received a group email showing that Workday's Sales Team wished to invite a former high official with the Baltimore City government to Rising Orlando 2022.[18]

---

[15] Ms. Hauck is a 2019 Alumnus of the LCLD Fellows Program representing Workday.

[16] *See* https://www.lcldnet.org/leaders-at-the-front/leader-pledges/Rich-Sauer/.

[17] Mr. Morse and Mr. Pincus both work in Workday's District of Columbia office.

[18] For entities like Workday that actively sell goods and services to U.S federal, state, and local governments, a proposed free invitation to Rising Orlando 2022 constitutes a "gift" pursuant to most government ethics regulations. *See, e.g.,* 5 CFR 2635.204(a) ("[U.S. g]overnment personnel may accept unsolicited gifts if they are not cash and are valued at or under $20 per source, per occasion" such that "[t]he aggregate limit from a single source" like Workday "must not be more than $50 per calendar year" if the gift does not fall within one of the three very narrow legal "exceptions").  Plaintiff, through having worked closely with Workday's Marketing Team in a legal advisory and

36.     The issue with the invite to Rising Orlando 2022 from an ethical and reputational perspective in Plaintiff's view, which he expressed to the other LCCA Team members on the email thread, was that the former official was under investigation for alleged criminal conduct while that person worked for Baltimore City, and the press had picked up the story.

37.     Plaintiff, as a longtime ethics, compliance, investigations, and public sector lawyer as well as a native Baltimorean, was acutely aware of the many public corruption scandals plaguing Baltimore, including the recent imprisonment of two former Baltimore mayors for crimes involving fraud and public corruption.

38.     On that basis, and after speaking with Mr. Pincus who expressed that he shared Plaintiff's view, **Mr. Pincus and Plaintiff both responded separately** in reply-all emails to the LCCA Team members that they thought it was inadvisable for Workday to pay for the former Baltimore City government official to attend Rising Orlando 2022.  Plaintiff and Mr. Pincus also referenced a news article detailing how this former official was at the time under criminal investigation.

39.     Ms. Hauck became angry with Plaintiff for sharing his view of the possible ethical issue with the LCCA Team members and told him to analyze the Workday contract with Baltimore City in a reply-all email.

40.     Plaintiff explained to Ms. Hauck in responding that reviewing the contract, as she had asked, would likely not be productive because his point was **not that Workday was legally prevented** from inviting the former Baltimore City government official to attend Rising Orlando 2022, but rather that **Workday should not do so for ethical and reputational reasons**.

41.     Ms. Hauck then ordered Plaintiff to review the Baltimore City contract once again via a

---

approver capacity, is personally aware that a ticket to any of Workday's Rising events has "a fair market value" of many thousands of dollars per invitee.  Workday spends millions of dollars annually on its Rising events, including Workday's second 2022 Rising event, which was held in Stockholm, Sweden.  *See* https://rising.workday.com/emea.html.

reply-all email.

42.     Plaintiff responded to Ms. Hauck that he did not have access to Salesforce, the repository for Workday contracts, because he was not a contract attorney.  Still, Plaintiff asked Ms. Hauck if she would not mind providing him (Plaintiff) with the Baltimore City contract via email so he could analyze it as she had asked.

43.     Ms. Hauck responded to Plaintiff's email request for the Baltimore City contract by asking him in a reply-all email why he did not have access to Salesforce.

44.     Upon information and belief, Rick Oleka, the black contract attorney responsible for the Baltimore City account (who also reports to Ms. Hauck and who was included on the email thread) provided Plaintiff with the contract via email, which Plaintiff then reviewed.

45.     After reviewing the Baltimore City contract, Plaintiff drafted a full analysis complete with citations, which he provided to Ms. Hauck and the other LCCA Team members via group email.

46.     At the end of his analysis, Plaintiff reached the same conclusion that he had originally stated to the group, namely that although there was no legal prohibition to Workday inviting the former Baltimore City government official to Rising Orlando 2022 and giving him thousands of dollars' worth of gifts, Workday should not do so because he was under criminal investigation related to illegal gifts.

47.     Without expressing an opinion about Plaintiff's analysis, conclusion, recommendation or even citations, Ms. Hauck forced Plaintiff to repeat his analysis multiple times and each time Plaintiff reached the same conclusion.

48.     Ms. Hauck then stopped responding to Plaintiff's emails altogether, which were at this point just directed to her.  Plaintiff had purposely removed the other LCCA Team members from his emails to Ms. Hauck because he did not want her to feel provoked or that he was trying to embarrass her.

49.     However, at the same time, Plaintiff was receiving urgent emails, Slack messages and Zoom meeting invitations from the (then) head of Workday's Sales Team and an Account Executive in his group demanding to know the answer to whether the LCCA Team would sanction them inviting the

former Baltimore City government official to Rising Orlando 2022.

50.    Plaintiff informed Ms. Hauck by email that the Sales Team was pressuring him for a response, and he repeatedly asked for Ms. Hauck's decision on his recommendation (again, **which Mr. Pincus**, who shares Plaintiff's employment level and membership on the LCCA Team, but who is white, **had also made to the group**).

51.    Ms. Hauck refused to respond to Plaintiff's email.  It was only when Plaintiff included all the LCCA Team members in the original email that Ms. Hauck finally and immediately responded to him, saying that Workday indeed should not invite the former Baltimore City government official who was under criminal investigation to Rising Orlando 2022, as Plaintiff and Mr. Pincus had recommended hours earlier.

52.    Ms. Hauck then instructed Plaintiff to communicate this information to the head of the Sales Team via a Zoom conference call.

53.    Plaintiff asked Ms. Hauck to attend the Zoom meeting because she routinely had much more interaction with the head of the Sales Team than Plaintiff had, Ms. Hauck was Plaintiff's manager, and she was the LCCA Team member who had made the final decision.

54.    Ms. Hauck assured Plaintiff that she would join the Zoom conference call and accepted the meeting invitation.  However, Ms. Hauck did not attend the meeting and so Plaintiff conveyed the decision not to invite the former Baltimore City government official to Rising Orlando 2022 to the head of the Sales Team as the lone LCCA Team representative.

55.    During the following weekly one-on-one meeting that Plaintiff had with Ms. Hauck, Plaintiff relayed what had occurred during his meeting with the head of the Sales Team, asked her if she had been angry with him, and then **apologized** to Ms. Hauck about the Rising Orlando 2022 incident even though Plaintiff had done nothing wrong.

56.    Ms. Hauck responded to Plaintiff by saying, "it takes far more than that to make me angry." Ms. Hauck's response was very ominous to Plaintiff as it reinforced his suspicion that she was

11

trying to undermine his position and added to the continuing hostile work environment at Workday.

### Ms. McFall's Intimidation, Bullying, Abuse and Harassment of Plaintiff Concerning the Global Annual Training, Which Workday Ignored

57.     During the first or second week of September 2022, Plaintiff made a presentation, assisted by Ms. Strelow, to Mr. Sauer and his direct reports Ms. Fedrow, Senior Vice President Susan Dahm (to whom Ms. Hauck reports), Vice President Jorga Jackson, and Senior Vice President Lisa McFall. The audience comprised Workday's most senior lawyers and compliance professionals.[19]

58.     During Plaintiff's presentation, he explained the legal criteria that he had developed for which Workday full-time employees and contractors around the world should be mandated to take the annual U.S. federal ethics and compliance training, a course Plaintiff had developed for Workday prior to Ms. Strelow being hired in 2021[20], and that Ms. Strelow greatly helped Plaintiff to improve in 2022.

59.     The online training course was estimated to take one hour to complete, could be completed in as many sittings as needed without starting over, and covered "cradle to grave" U.S. federal government contracting.[21]

60.     Following Plaintiff's presentation to Mr. Sauer and his direct reports, Ms. McFall

---

[19] Senior Director Scott Helsinger who (upon information and belief) also reports to Mr. Sauer, and Ms. Hauck also attended the meeting.

[20] Jill Keller (black female), the paralegal who reports to Ms. Hauck, was also instrumental in the creation and successful rollout of the Workday 2021 U.S. federal ethics and compliance training, as were many others.

[21] Plaintiff has consistently recommended to Mr. Sauer, Ms. Dahm and other leaders that Workday should take "a purposely expansive view of who should take the [... U.S.] federal compliance and ethics training given" that U.S. federal government contracting is a "Strategic Growth Initiative" for Workday; "[t]he overwhelming majority of [Workday's] workforce... is new to [U.S.] federal government contracting"; Workday's "current business model is to have certain [full-time employees] and contractors support commercial, [U.S. state, local, educational] and [U.S.] federal contracts simultaneously, and [thus Workday has] no way to prevent unintended spillover of people into [U.S.] federal"; "[v]iolations of [U.S.] federal regulations and laws can have significantly negative legal, financial and reputational consequences for Workday ... including extensive fines and penalties, suspension, debarment, third party lawsuits, and even criminal charges"; "[t]he risks of noncompliance with [U.S.] federal regulations can also have unintended consequences for [Workday's] business"; "[a]nd it will be difficult to 'separate' Workday from future bad actors it employs in the eyes of [U.S.] federal contracting officers, auditors and investigators if Workday does not have a sophisticated [U.S.] federal ethics and compliance program where its [full-time employees] and contractors supporting [U.S.] federal take regular federal training courses, that are tracked, and the attendees' agreement to adhere to the course curriculum is a prerequisite for completion."

passionately disagreed with Plaintiff's assessment, stating that she did not want anyone in her group, which numbered in the hundreds worldwide, to be **mandated** to take the annual U.S. federal ethics and compliance training because she believed they were "too busy" and "suffered from training fatigue."

61.     Nonetheless, Mr. Sauer overruled Ms. McFall during the meeting by saying that he agreed with Plaintiff.

62.     Ms. McFall was visibly incredibly angry during this exchange.

63.     On September 19, 2022, during a follow-up planning and implementation Zoom conference call that just included Plaintiff, Ms. McFall, Ms. Fedrow and Ms. Strelow (Ms. Hauck stated that she was too busy to attend the meeting just prior to the call), Ms. McFall (white female) loudly and publicly screamed at Plaintiff, stating that "everybody knows you don't want to do work, Anthony!"

64.     Plaintiff responded politely but firmly to Ms. McFall that he thought her insulting characterization of him was unfair; that he absolutely did want to do the work, as evidenced by Plaintiff's many recommendations to Ms. McFall and other Workday leaders about who within their groups should have to take the training based on legal requirements and industry best practices, which he hoped Ms. McFall would abide by; but that Plaintiff could not and would not make the ultimate decision for Ms. McFall of who in her group would have to take the training course.

65.     Ms. McFall then angrily and loudly doubled down by again questioning Plaintiff's work ethic in front of everyone, resorting to the racist trope that Plaintiff, as the lone black person in the meeting, was shiftless, lazy and did not want to do his job.

66.     Per Workday's Code of Conduct and corresponding policies[22], Plaintiff escalated this incident by telling Ms. Hauck about Ms. McFall's objectionable behavior that had occurred on September 19, 2022 during their next weekly one-on-one call because Ms. Hauck is Plaintiff's manager.

67.     Plaintiff told Ms. Hauck that "the optics looked terrible for Workday" and "the incident

---

[22] *See* https://www.workday.com/content/dam/web/en-us/documents/investor/workday-code-of-conduct-2023.pdf.

appeared racist to me" that Ms. McFall had repeatedly yelled at him and insulted his work ethic during a team call because she was angry that Mr. Sauer had agreed with Plaintiff over her.

68.     Ms. Hauck responded to Plaintiff, saying, "OK, I understand."  However, Workday did not discipline Ms. McFall for her discriminatory and retaliatory behavior toward Plaintiff on September 19, 2022.

### Ms. Dahm's and Ms. Hauck's Retaliation Against<br>Plaintiff Regarding Working with and Supervising Ms. Strelow

69.     Earlier that week in September 2022, Ms. Hauck and Ms. Dahm had retaliated against Plaintiff by arbitrarily and capriciously prohibiting him from working with and supervising Ms. Strelow although the two had worked together successfully since shortly after Plaintiff wrote Ms. Strelow's position description and advocated for her to be hired.

70.     Ms. Strelow is the programmatic lead on all of Workday's U.S. federal compliance work and Plaintiff is the U.S. federal compliance legal subject matter expert.

71.     One of the vague, unspecific, pretextual reasons Ms. Hauck and Ms. Dahm gave for prohibiting Plaintiff from working with or supervising Ms. Strelow (and at times also working with Ms. Fedrow) was a desire to ensure that "the resources we are using **feel appropriately used and that we aren't over taxing them.**"[23]

72.     On October 12, 2022, Plaintiff had been working alone for weeks to create and edit complex Google slides, Google sheets, Excel spreadsheets, and search queries within the Workday application to select the global Workday employee and contractor audience who would have to take the annual U.S. federal ethics and compliance training.  In addition, Plaintiff was fulfilling his other responsibilities in supporting Workday's U.S. federal and other public sector compliance programs.

73.     Although Ms. Hauck and Ms. Dahm had blocked Plaintiff from working with Ms.

---

[23] On multiple occasions in September and October of 2022, Ms. Hauck and Ms. Dahm—together in meetings and separately—expressed similarly vague and unspecific reasons for why Plaintiff could no longer work with nor supervise Ms. Strelow.

Strelow on or about September 16, 2022, Plaintiff finally asked Ms. Strelow, an expert at coordination and project management, for her help on October 12th, in part, because his disability prevented him from doing this work on his own.[24]

74.    Additionally, Plaintiff asked Ms. Strelow to help him because creating and maintaining Workday's entire U.S. federal and other public sector compliance infrastructure on his own—despite **Workday having specifically hired Ms. Strelow to work with and assist Plaintiff** with this undertaking—was an "overtaxing," impossible, and thus abusive workload for any one person.

75.    Plaintiff tried in vain to do this work single-handedly for more than two weeks to no avail so he finally asked Ms. Strelow for her assistance, which she kindly agreed to, because Plaintiff thought it was much more important to get the work done correctly by collaborating with Ms. Strelow than to not work collaboratively and have the project fail—precisely what Ms. Hauck and Ms. Dahm appeared to have wanted to happen.

76.    After Plaintiff delivered the work Ms. Hauck had asked of him, Ms. Hauck with Ms. Dahm copied on the email asked Plaintiff "how" he managed to successfully complete the search query in the Workday tool, which identified and counted the previous year's global employee and contractor training audience for the purpose of mapping the current year's potential training audience.

77.    Plaintiff initially misunderstood Ms. Hauck to have asked him "what" his internal query had produced, and so he answered accordingly.

78.    Dissatisfied with Plaintiff's response, Ms. Hauck then clarified her question by explaining that it was "actually much more tactical than substantive."

79.    Finally understanding the nature of her question, Plaintiff responded to Ms. Hauck by telling her and Ms. Dahm the truth—that it was Ms. Strelow (affectionately referred to sometimes as "C-Lo") who had helped him to run the search query.

---

[24] Ms. Hauck and Ms. Dahm had been aware of Plaintiff's cognitive and memory challenges since he revealed those issues to them in August 2021.

80.     If there was any doubt at that point that Ms. Hauck and Ms. Dahm were uninterested in the correctness of the work but only in preventing Plaintiff from working with, receiving aid from or supervising Ms. Strelow, Ms. Hauck (with Ms. Dahm copied) responded by saying, "OK, thanks for the info."

81.     Plaintiff had no apparent recourse and could only just respond, "You're very welcome!" as he at that moment had confirmation that Ms. Hauck and Ms. Dahm were looking to undermine him, permanently damage his career and professional standing, and ultimately make it impossible for Plaintiff to be considered for any promotion or upward mobility within the company.[25]

82.     Due to stress, exhaustion, mental and physical trauma associated with this and other disparate, racist, ableist and retaliatory treatment directed towards him by Workday, Plaintiff was hospitalized in a Maryland medical facility later that evening, where he remained from October 12, 2022 through November 10, 2022.

### Workday's Misleading of Police Causing Them to Go to Plaintiff's Home, Traumatizing, Humiliating and Physically Endangering Plaintiff's Wife and Children

83.     Prior to being admitted, however, Plaintiff sent two emails on the evening of October 12, 2022 from his cellphone to Ms. Hauck stating, **"I'm having a medical emergency and am headed to the hospital"** and **"I'm in the hospital waiting room now with my wife[,]"** respectively.

84.     Plaintiff also filled out and sent from his cellphone a third email—an online Workday leave request form—wherein Plaintiff let Ms. Hauck know he would be filing the proper FMLA paperwork as soon as he could, meaning he might need to take extended medical leave beyond October 12th because he was being hospitalized but he did not know for how long.

85.     Ms. Hauck responded to Plaintiff on October 13, 2022, saying in relevant part:

---

[25] Upon information and belief, although Workday consistently refused to promote Plaintiff and many of its relatively few black employees to appropriate employment levels during the period relevant to this Complaint, Workday promoted Ms. Hauck, Ms. Dahm, Ms. McFall, and Mr. Sauer during this period.

I wanted to pass along a bit of information (in case you need/want it) **in response to your comment around FMLA in the time off request you submitted last night**. If you have any questions regarding FMLA, you can contact Unum (who handles Workday's FMLA) at 866-865-9092. Feel free to also reach out to [Workday's HR team] P&P via Service Hub and they can provide additional direction. **Please don't worry about work and focus on feeling better.**[26]

86.     Inexplicably, however, on the evening of October 20, 2022, Workday sent police to Plaintiff's home under the guise of a so-called "Workday Wellness Check."

87.     Workday did this despite knowing from **three emails** Plaintiff sent it on the evening of October 12th that (a.) Plaintiff was receiving medical treatment in a hospital, (b.) with the full knowledge and support of his wife, and (c.) he would in "good faith" provide Workday with proper FMLA documentation as soon as reasonably possible, as permitted by the law.

88.     Plaintiff's wife arrived after dark at their Silver Spring, Maryland home on the evening of October 20th with their two sons in tow, then ages 13 and 9.  Mrs. Hill had been driving their sons home from their weekly math tutoring session and family pizza dinner when she was confronted by three squad cars, lights flashing, full of (armed) Montgomery County Police parked in the Hills' driveway, which is located at the end of a cul-de-sac in a quiet Washington, D.C.-adjacent bedroom community.

89.     The police, who had initially gone to multiple neighbors' houses searching for Plaintiff, then demanded that Mrs. Hill tell them where her husband was.

90.     Shaken and afraid for herself and her children, Mrs. Hill responded that Plaintiff was in the hospital, prompting the police to shove the phone number of the "Workday Security Team" in her face, instructing her to call them immediately.

91.     On the afternoon of October 21, 2022, a staff person in the medical facility where Plaintiff was receiving treatment approached him and asked, "you Anthony?"  Plaintiff answered, "yes."

---

[26] In addition to FMLA, Unum is the insurance company that handles Workday's employee disability claims.

The staff person then said, "police are at your house, man." At that moment, Plaintiff had a massive panic attack which mimicked symptoms of a cardiac arrest as he experienced chest pains and could not breathe.

92.     Plaintiff was also unable to call his wife or anyone because of the medical facility's strict policy prohibiting patients from contacting anyone in any way until the 15th day of inpatient treatment.

93.     Plaintiff then frantically located his Clinical Case Manager, Kristin Anderson-Clouse. Ms. Anderson-Clouse tried to calm Plaintiff and allowed him to use her office phone to call his wife, who explained to him that the so-called "Workday Wellness Check" had occurred at their home the prior evening.

94.     Plaintiff's heightened emotional state calmed somewhat while speaking with his wife for the very first time since he had been admitted to the medical facility on October 12th.

95.     Ms. Anderson-Clouse then helped Plaintiff's wife draft an email to Ms. Hauck and Ms. Dahm, stating in relevant part:

> I want to **reassure** you that [my husband] Anthony is safe and receiving ongoing medical treatment at a Maryland facility. His medical team has estimated that he will need approximately 3 more weeks before he is able to return to work full-time.

96.     Mrs. Hill purposely used the word "reassure" in her October 21, 2022, email to Ms. Hauck and Ms. Dahm about her husband because she knew (as both Ms. Hauck and Ms. Dahm did) that on October 12, 2022, Plaintiff had already assured Workday (in writing) that his wife had taken him to the hospital and Plaintiff would be submitting proper FMLA paperwork, which Ms. Hauck acknowledged (in writing) on October 13, 2022.

97.     Ms. Dahm then proceeded to gaslight Mrs. Hill with her response to Mrs. Hill's email, stating:

> Dear Hanadi: **Thank you so much for letting us know**. We wish our very best to you and Anthony. We have been in contact with our HR team and I am advised that they are in contact with you to support your request. Please do reach out if there is **anything further we can do to support you**.

98.     The U.S. Department of Labor ("DOL") requires employers like Workday to allow employees "15 calendar days" **at a minimum** to supply complete medical certification under the FMLA.[27]

99.     Due to the racist and ableist discrimination and retaliation that Workday had previously subjected Plaintiff to, he had been anxious and worried about compliance with the FMLA when he was admitted to the medical facility. Nonetheless, the doctors, nurses and administrative staff assured Plaintiff that he should not be concerned because of this legal protection.

100.    The medical facility where Plaintiff was receiving treatment informed him that it would supply the required FMLA paperwork to Unum well within 15 days, which it did.

101.    Plaintiff took short-term disability and employer-approved medical leave from October 12, 2022 to November 22, 2022.

102.    Workday knew Plaintiff was on short-term disability and employer-approved medical leave but still sent police to his residence to conduct an alleged "Workday Wellness Check," which is indefensible because Workday knew Plaintiff **in fact was not even at home**, but instead was receiving inpatient care with the help of qualified medical professionals and his family.

103.    Workday's racist, ableist and retaliatory weaponization of law enforcement in this manner caused Plaintiff and his family great emotional distress during an especially distressing time[28], particularly since Plaintiff's boys—whom Plaintiff had never been away from for an extended period, and

---

[27] "An employee must provide the requested certification to the employer within 15 calendar days after the employer's request, unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts or the employer provides more than 15 calendar days to return the requested certification[,]" 29 CFR § 825.313. *See Crane v. Gore Design Completion, Ltd.*, 21 F. Supp.3d 769 (W.D. Tex. 2014); *see also* https://www.shrm.org/hr-today/news/hr-news/conference-today/Pages/2018/6-Ways-Managers-Get-into-FMLA-Trouble.aspx.

[28] On the night of October 20, 2022, following this harrowing ordeal with police, Plaintiff's mother came to the house and stayed until morning, providing comfort and support to Mrs. Hill and her children in Plaintiff's absence.

whom he could not contact by strict rule until October 27, 2022—had never been subject to any encounters with law enforcement.

104.    Moreover, neighbors witnessed officers at the Hills' home (and their homes as well) patrolling their neighborhood at night, lights flashing, searching high and low for Plaintiff as if he were a fugitive from justice, a runaway to be brought to heel, or some prized item of Workday property to be seized and recovered by an armed police force.[29] This was extremely disempowering, dehumanizing, subjugating, painful, and humiliating to Plaintiff, Mrs. Hill, and their children—a family that has tried to "play by the rules."

105.    By misleading the police and causing them to go to Plaintiff's home on the night of October 20, 2022, which is **potentially a crime**[30], Workday endangered the lives of Mrs. Hill, their two sons, the police, and the community in which the Hills have owned their home for over 15 years.[31]

106.    This needless event could have ended in tragedy.

107.    In a subsequent email to Plaintiff from Workday HR, Workday told him the following:

---

[29] See https://nleomf.org/slave-patrols-an-early-form-of-american-policing/; https://www.wsj.com/articles/andrew-bibby-what-to-the-slave-is-the-fourth-of-july-1404342530.

[30] Maryland's Criminal Law Article Section 9-501 states the following:

> (a) Prohibited. -- A person may not make, or cause to be made, a statement, report, or complaint that the person knows to be false as a whole or in material part, to a law enforcement officer of the State, of a county, municipal corporation, or other political subdivision of the State, or of the Maryland-National Capital Park and Planning Police with intent to deceive and to cause an investigation or other action to be taken as a result of the statement, report, or complaint.

> (b) Penalty. -- A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 6 months or a fine not exceeding $ 500 or both.

[31] See, e.g., https://www.cnn.com/2019/10/19/us/wellness-check-police-shootings-trnd/index.html; see also https://www.nytimes.com/2020/07/06/nyregion/amy-cooper-false-report-charge.html; https://www.washingtonpost.com/investigations/interactive/2022/police-shootings-mental-health-calls/.

Hope you had a nice weekend! Yes, I can confirm that the Wellness Check was completed on 10/20. **We will not be providing any further documentation regarding the decision to conduct a Wellness Check**.

108.    To be clear, **the only documentation** Workday has given to Plaintiff at all about its "Workday Wellness Check" is this email (above) confirming the date **when** it happened.

109.    Workday refuses to give any information concerning **why** it did this to Plaintiff and his family other than that it is responsible, saying that a new hire in HR whom Plaintiff had never met, Jazsmine Gordon (black female), decided to conduct the "Workday Wellness Check" on her own.  Senior Workday HR representative Lauren Eyler (white female) identified Ms. Gordon, her Workday HR colleague, as the sole Workday employee responsible for the "Workday Wellness Check" when Ms. Eyler and Plaintiff met via Zoom on March 7, 2023.

110.    Workday also will not tell Plaintiff **what** misinformation it provided to the Montgomery County Police to prompt them to go to his home on the evening of October 20, 2022—an Orwellian misuse of law enforcement officers as unwitting extensions of the "Workday Security Team" in furtherance of Workday's discrimination, retaliation, and harassment campaign against Plaintiff.

111.    Workday also refuses to name anyone (apart from Ms. Gordon) **who** participated in its "Workday Wellness Check."

112.    Additionally, Workday will not give information about **how** a staff member at the medical facility where Plaintiff was a patient somehow knew on October 21, 2022 that police had been at Plaintiff's home the prior evening if Workday did not know that (or **where**) Plaintiff had been admitted, nor why that person revealed this information to Plaintiff in such a nonchalant and callous manner.

113.    At its core, the actual purpose for the wrongly named "Workday Wellness Check," **which Workday now seems intent on covering up**, was to harm Plaintiff.

114.    Mrs. Hill, her children, neighbors, the public, the Montgomery County Police, and (almost certainly) the law were all just unimportant collateral damage to Workday in achieving this discriminatory and retaliatory objective.

21

***Ms. Hauck's Retaliation Against***
***Plaintiff by Changing His "Essential Job Functions"***
***While He Was on Leave Without Engaging in the Interactive Process***

115.    Sometime between October 12, 2022 and November 22, 2022 while Plaintiff was on short-term disability and employer-approved medical leave, Ms. Hauck changed the "essential job functions" for his position.

116.    When Plaintiff returned to work, Ms. Hauck had added expert contract-drafting and negotiation skills to his job duties without engaging in the "interactive process" as required by the D.C. Family & Medical Leave Act for employees who need "reasonable accommodation."

117.    When Plaintiff spoke to Ms. Eyler in March 2023, she attributed Ms. Hauck's changing of the "essential job functions" for Plaintiff's position without having engaged in the interactive process as a "simple mistake" and dismissed it as "not a big deal."

***Ms. Hauck's Retaliation Against Plaintiff After He Returned***
***from Leave by Disparaging People Who Take Personal Leave***

118.    Plaintiff's first meeting after returning from leave included Ms. Hauck, Mr. Morse, and Mr. Pincus as attendees, and occurred on or about November 28, 2022.[32]

119.    Ms. Hauck said the following during the Zoom meeting call: "I wish I could just take the month off."[33]  Mr. Morse reacted to Ms. Hauck's comment by putting both of his hands over his face and saying nothing.  Mr. Pinkus laughed nervously.  Plaintiff was mortified but also said nothing and simply

---

[32] Mr. Morse, Mr. Pincus, Ms. Hauck, and Plaintiff have a weekly call during which they discuss U.S. federal issues affecting Workday's business, and so Plaintiff's month-long absence from those weekly meetings (while he was on short-term disability and employer-approved medical leave from October 12, 2022 to November 22, 2022) would have been known to Mr. Morse and Mr. Pincus.

[33] Ms. Hauck, a Workday contract attorney, told Plaintiff, Mr. Morse, and Mr. Pincus that she had been representing Workday in a contract negotiation with a Workday client.  The attorney representing the Workday client with whom Ms. Hauck had been negotiating took personal leave for about one month during the negotiation, slowing down the contacting cycle.  Because **Workday measures Ms. Hauck's productivity in large part by how quickly she can successfully negotiate and "close" Workday contracts** (so that Workday can "recognize" and publicly report the anticipated revenue), according to Ms. Hauck, the fact that this attorney had taken extended personal leave during the contract negotiation process had frustrated Ms. Hauck.

smiled. Ms. Hauck then ended the meeting by asking Plaintiff if he had anything to say, to which Plaintiff responded that he did not.

120.    During their next weekly one-on-one meeting after her disparaging comment about individuals who take leave, Ms. Hauck said to Plaintiff that either Ann Sandor or Ann Speyer (both are Workday employees) "is always taking leave, I swear!" Plaintiff did not respond or ask Ms. Hauck for clarification about which "Ann" she had been referring to because he believed Ms. Hauck's comment to be generally inappropriate and specifically hostile towards him considering that Plaintiff had recently returned to work after approximately one-month of leave.

### Ms. Hauck's Harassment of Plaintiff After He Returned from Leave by Pressuring Him to Work During a Medically Excused Absence

121.    Before returning to work after his employer-approved medical leave, Plaintiff's treating physician placed him on a modified work schedule. Plaintiff's Workday and Unum-approved, modified work schedule was Tuesdays - all day, Thursdays - all day, and Mondays, Wednesdays, and Fridays from 2 PM to 5:30 PM Eastern, until further notice.

122.    Plaintiff had communicated to Workday HR and Ms. Hauck his employer-approved work schedule prior to returning to work, which she acknowledged by email.

123.    On Friday, January 13, 2023, when Plaintiff was on leave dealing with medical issues (including therapy and a laboratory test), Ms. Hauck contacted him at 11 AM via Slack messenger and asked if he planned to attend a work meeting that had just begun. When Plaintiff saw Ms. Hauck's Slack message an hour later, he responded that he was not going to the Workday meeting because he was on medical leave.

124.    Ms. Hauck never acknowledged or indicated in any way that she had asked Plaintiff to attend the meeting by **mistake**. Rather, she chose to say nothing to Plaintiff in response.[34]

---

[34] https://www.workday.com/content/dam/web/en-us/documents/investor/workday-code-of-conduct-2023.pdf.

125.    Ms. Hauck's silence was deafening and spoke loudly, further proof of Workday's continuing hostile treatment and bullying of Plaintiff.

126.    When Plaintiff spoke with Ms. Eyler in March 2023 about this incident, Ms. Eyler dismissed its significance, rationalizing that "you have so many schedules that [Ms. Hauck] probably just got confused."

127.    When Plaintiff asked Ms. Eyler why Ms. Hauck chose not to acknowledge or indicate that she had asked Plaintiff to attend the work meeting by mistake or had "just got[ten] confused" if that is what happened, Ms. Eyler asked Plaintiff, "how do I know that you didn't do anything to [alter] the Slack message?"

128.    When Plaintiff pushed back and insisted that he had not altered the Slack messenger conversation with Ms. Hauck, Ms. Eyler responded, "well then [Ms. Hauck] was probably just busy."

### Ms. Hauck's Retaliation Against Plaintiff by Publicly Excluding Him from Team Acknowledgement and Praise

129.    Ms. Hauck's silence was also deafening and spoke loudly when she sent an email to her entire team thanking her direct reports for their hard work over the previous year (sent sometime in late 2022 or early 2023).  Within that email, Ms. Hauck thanked members of her team by name and described one or more of their work accomplishments over the previous year.

130.    Conspicuously absent because he was the only person on her team whom Ms. Hauck did not thank, acknowledge, or even mention at all within her "thank-you" email to her direct reports was Plaintiff.

131.    This was a blatant, cruel, and purposeful act of public shaming by omission whereby Ms. Hauck tried to humiliate Plaintiff in the presence of his colleagues.

### Ms. Hauck's Retaliation Against Plaintiff by Refusing to Approve His Paid Time Off Request and Preventing Him from Working with the Corporate Legal Team

132.    On January 25, 2023, Plaintiff tried to take Paid Time Off ("PTO") for the day to attend to personal issues, a process at Workday which requires managerial approval.  Ms. Hauck demanded for

Plaintiff to justify why he needed to take PTO, wanting to know if Plaintiff would attend his scheduled work meetings for the day instead.

133. After 2 years of having passively endured Ms. Hauck's continuous discrimination, retaliation and harassment, Plaintiff finally asserted himself to Ms. Hauck by (a.) letting Ms. Hauck know that her inappropriate demand made him "VERY uncomfortable[;]" (b.) explaining to her what contingency plans he had made for his scheduled work meetings prior to requesting PTO; and (c.) even offering "[i]f need[ed] to provide information from [his] doctors to Unum" specifying the medical reasons for his PTO request.

134. **Ms. Hauck again responded to Plaintiff by not responding to him**, rehashing her well-worn retaliatory tactic. Notably, Ms. Hauck also would not approve Plaintiff's PTO request.

135. Within his January 25th email, Plaintiff also told Ms. Hauck that he had been working early that morning on various Workday projects prior to 5:30 AM (before Plaintiff even knew he needed to take PTO), including providing information that Workday Deputy General Counsel Juliana Capata (white female) and her Corporate Legal team had requested from Plaintiff necessary to produce Workday's 10-K statement.

136. Importantly, Plaintiff had **only told Ms. Hauck about his working with Ms. Capata and the Corporate Legal team.**

137. After providing Ms. Capata and her team with the information they had requested from him, Plaintiff followed up by email the next day and asked if the information he provided was sufficient. Ms. Capata and her team did not respond to Plaintiff's status request email.

138. A day or two later, again Plaintiff requested a status update and feedback on the information he had provided and again Ms. Capata and her team refused to respond to Plaintiff's (second) status request email.

139. While Plaintiff had become all too accustomed to Ms. Hauck's retaliatory refusal to answer his valid questions, this punitive silence was unusual for Ms. Capata and Workday's Corporate Legal team.

140. To add insult to injury, that same week when Plaintiff visited Workday's Pleasanton, California office (where Ms. Capata works) for Workday's LCCA Summit, Ms. Capata frowned and glared at Plaintiff in an in-person, small group, breakout meeting although in the past she had always been friendly, kind, and talkative to Plaintiff in person and via Zoom.

141. It was clear to Plaintiff at that moment that Ms. Hauck had asked Ms. Capata (and by extension Workday's Corporate Legal team) not to work with Plaintiff as further retaliation because he had engaged in protected activity.

142. Unreasonably refusing to approve Plaintiff's PTO request and preventing him from working with colleagues because of Plaintiff's legally protected January 25, 2023 email to Ms. Hauck was the latest salvo in Workday's continuing campaign of hostility against Plaintiff.

143. Ms. Hauck and Ms. Capata, who are both 2019 Fellows of the Leadership Council on Legal Diversity Program representing Workday, had no justification for discriminating and retaliating against Plaintiff which, in this circumstance, forced Plaintiff to reach out to Ms. Fedrow, Ms. Jackson (black female), and eventually Workday HR about the issues, as well as to be able to take personal leave for the day.

144. Upon information and belief, Plaintiff has taken less PTO on average than Ms. Hauck or any other member of her team.

### *Workday's Retaliatory Use of its Peakon Software-Generated Mandatory Weekly Survey*

108.     Workday bought software company Peakon in 2021 for $700 million.[35]  Workday makes its workforce, including Plaintiff, answer Peakon software-generated survey questions about their employment experience at Workday every week.

109.     Since Plaintiff has not wanted to lie in answering the mandatory Workday survey questions but he has also feared retaliation from Workday for telling the truth, Plaintiff has consistently refused to answer questions related to manager conduct.

110.     Instead, Plaintiff has routinely responded to the follow-up Workday survey questions asking "why" he has refused to answer individual questions about manager conduct by selecting "other" as his response.

111.     When Plaintiff spoke to Ms. Eyler in March 2023, she revealed that Workday uses the mandatory weekly survey as both a "sword and a shield" in retaliating against Plaintiff and other similarly situated members of Workday's workforce for engaging in protected activity.

112.     Whenever a Workday employee makes a good-faith complaint to Workday HR about their manager, Ms. Eyler said that she and other Workday HR professionals review that individual's past positive responses to mandatory weekly Workday survey questions to "shield" Workday and its management from negative employee complaints and to attack the veracity of the employee complaint and/or complainant.

113.     On the other hand, Ms. Eyler revealed that Workday HR does not afford any added credibility or "weight" to complaints made by Workday employees, including Plaintiff, who in the past have refused to answer mandatory weekly Workday survey questions about their managers, or have answered such questions with negative responses about Workday or its management.

***Workday's Continuing Retaliation Against Plaintiff by Refusing
to Issue RSUs it Promised Him in Writing and Cutting His Bonus by 50%***

---

[35] https://www.thestreet.com/investing/workday-shares-up-peakon-purchase-closed-jp-morgan-focus-list.

145.    In addition to his normal base salary and the opportunity to earn a targeted yearly bonus, Plaintiff negotiated $200,000 in Restricted Stock Units ("RSUs")[36] over four years with a 40% to 60% stock refresher annually.

146.    Plaintiff received an RSU grant of approximately 23% of his base salary in 2022.

147.    When Plaintiff raised this issue with Ms. Hauck, she responded that she would speak to her superiors about his concern.  Ms. Hauck later said to Plaintiff during their next weekly one-on-one meeting that she had in fact spoken to her superiors and based on that conversation Plaintiff needed to accept the RSU grant he had received.

148.    The delta between the 23% RSU grant that Plaintiff received from Workday in 2022 and the 40% to 60% overall stock refresher annually that Workday promised him in writing equals a loss to Plaintiff of between $40,000-$60,000 in additional compensation **every year**.

149.    Plaintiff has received **no RSU refresher from Workday in 2023**, added confirmation of Workday's continuing retaliation against Plaintiff for having engaged in protected activity.

150.    Additionally, for 2022, Workday awarded Plaintiff approximately half of the annual bonus payment which medium to high-performing Workday employees like Plaintiff were promised by the company (paid in or about April 2023).

151.    Plaintiff has never received a single negative performance review or evaluation from Workday since he was hired by the company, and so there is no legal justification for this substandard bonus award.

152.    To the contrary, Plaintiff has received numerous positive written acknowledgements celebrating his work from Ms. Strelow (who referred to Plaintiff as a "mentor"), Ms. Fedrow, and other Workday employees publicly posted within the company's internal portal viewable to the more than 12,500 Workday employees and consultants worldwide.

---

[36] RSUs are "deferred compensation," not a bonus.  *See* https://www.natlawreview.com/article/equity-compensation-and-rise-restricted-stock-units.

153.    When Plaintiff's counsel asked Workday on his behalf **twice** to explain his unjustifiably low 2022 bonus award[37], Workday initially stated that Plaintiff "needs to speak with [Ms. Hauck]" to get an answer.  Following that, Workday refused to answer the question at all.

154.    Workday's refusal to explain or justify Plaintiff's substandard bonus award for calendar year 2022 (totaling many thousands of dollars) is additional confirmation of Workday's continuing retaliation against Plaintiff for having engaged in protected activity.

### *Ms. Dahm's Reflexive and Habitual Disbelieving of Plaintiff Unless a White Person Has Verified His Statement, or Ignoring Plaintiff Altogether*

155.    In 2022, during a weekly Zoom meeting that included Ms. Dahm, Ms. Hauck, and Ms. Hauck's direct reports, Plaintiff responded to Ms. Dahm's question to the group about whether a U.S. federal contract could be invalidated if signed by a high-level U.S. federal official who was not expressly empowered to "bind" the U.S. government and sign its contracts.

156.    Plaintiff answered Ms. Dahm's question in the affirmative, stating that indeed such a contract would be legally void because only U.S. federal contracting officers possess this authority.[38]

157.    Responding to Plaintiff's answer, Ms. Dahm made a disbelieving facial-expression and emphatically said to the group, "that **can't** be true!"  It was only when Ms. Hauck and the Director, Associate General Counsel who reports to Ms. Hauck (both white females) together affirmed Plaintiff's assertion that Ms. Dahm said she then believed it to be true.

158.    Furthermore, prior to his hospitalization in 2022, Plaintiff forwarded multiple emails to Ms. Dahm "speaking up" and seeking assistance from her regarding what he believed to be especially troubling conduct by Ms. Hauck.

---

[37] Plaintiff was on approved medical leave at the time and could not ask Workday HR this question himself.

[38] https://www.acquisition.gov/far/4.101.  FAR 4.101, the legal authority for this bedrock U.S. federal contracting principle is explained within Workday's global U.S. federal ethics and compliance training—the very course Plaintiff developed for Workday in 2021, and he and Ms. Strelow improved upon in 2022.  Ms. Dahm, Ms. Hauck, the members of Ms. Hauck's team, and thousands of other Workday full-time employees and contractors around the world were required to complete and pass those training courses.

159.    Plaintiff has not received a single response nor witnessed any action from Ms. Dahm.

160.    In early 2021, Plaintiff had eagerly joined Workday as a respected attorney in his field—respect he earned through hard work and a penchant for relationship-building established over his successful legal career.  Plaintiff has without question added value to Workday.

161.    As an example, during the last week in February 2023, Plaintiff spoke **during his free time on Workday's behalf** on a panel at a legal conference in Laguna, Niguel, California that featured other prominent global corporations and their lawyers.  Plaintiff was invited to speak at the conference by the Government Contracts Group Co-Chair (a friend) of the international law firm Crowell & Moring.[39]

162.    As he wrote by email to Ms. Fedrow and key members of WIT when he excitedly returned from presenting (and learning) at Crowell & Moring's conference, Plaintiff had gained valuable "insights into how similar companies [to Workday] are approaching public-sector compliance"—knowledge Plaintiff planned to share to improve Workday.

163.    This is but one of many examples of why Ms. Dahm's, Ms. Hauck's, Ms. McFall's, Ms. Capata's, and Mr. Sauer's continued practice of ignoring, undervaluing, undermining and/or publicly shaming Plaintiff is not only illegal, but it is also irrational and counterproductive to Workday considering Plaintiff's contributions (and the contributions of other black Workday employees) to the company.

### *Workday's Retaliation Against Plaintiff by Placing Him on Administrative Leave Without Just Cause*

164.    On March 16, 2023, Workday HR (through Ms. Gordon) invited Plaintiff to a meeting with Ms. Hauck for Plaintiff "to get reset and aligned with [his] manager moving forward."

---

[39] Crowell & Moring is a renowned "white shoe" law firm and Workday's Government Contracts outside legal counsel.  Many years before Plaintiff joined Workday, Crowell & Moring had previously extended Plaintiff an invitation to speak at its Government Contracts Conference, which it holds annually.

165.    Plaintiff politely responded to Workday HR's meeting request, asking Ms. Gordon to

"please invite Chris Fedrow" because Plaintiff did not "feel comfortable" or safe "meeting with just" Ms.

Hauck "alone … given the circumstances."[40]

166.    Workday's continued refusal to explain to Plaintiff why it weaponized its "Workday

Wellness Check" and law enforcement against his wife and sons when it knew Plaintiff was

hospitalized—**which Workday now seems actively engaged in covering up**—has caused Plaintiff

trauma, extreme anxiety, and outright panic, including at the thought of meeting with Ms. Hauck and

Workday HR alone.

167.    Ms. Gordon rejected Plaintiff's request to invite Workday's own Chief Integrity and

Compliance Officer, Ms. Fedrow, to the meeting (as a bystander or nonparticipant), stating:

> **Chris Fedrow is not your People Leader and it would be inappropriate
> for her to join**, however I will be joining the call with you.

168.    Basic common sense and evidence belie the notion that Ms. Gordon[41] flatly rejected

Plaintiff's request to invite Ms. Fedrow after calling it "inappropriate" without being directed to do this

by Ms. Dahm, Ms. Hauck and/or other Workday leaders who are also complicit in directing the "Workday

Wellness Check."

169.    This is a **conflict of interest** for which Workday must be held to account.[42]

---

[40] Plaintiff included Ms. Hauck in his reply-all email response to Ms. Gordon requesting to also invite Ms. Fedrow to the Workday HR meeting.

[41] Upon information and belief, Ms. Gordon started her job at Workday about two months before the."Workday Wellness Check." *See* https://www.linkedin.com/in/jazsmine-gordon-phr-380aab4b/.

[42] https://www.workday.com/content/dam/web/en-us/documents/investor/workday-code-of-conduct-2023.pdf. Workday not only floats the law through its unlawful treatment of Plaintiff, but with its troubling conflicts of interest, Workday also selectively and inconsistently applies its own employment policies and rules. *See EEOC v. Kohler Co.*, 335 F.3d 766 (8th Cir. 2003) (holding that a jury reasonably concluded there was retaliation when an employee complained about discrimination in light of a company's inconsistent enforcement of its policies and disciplinary rules); *Hexcel Corp. v. Lab Commission*, 2022 UT App. 52 (Utah Ct. App. 2022) (affirming a decision holding that a company was liable for discrimination and/or retaliation when it disciplined an employee based on vague, ever-evolving, and inconsistently enforced company policies); *accord Freeman v. District of Columbia Department of Employment Services*, No. 89-362 (D.C. Cir. 1990) (similar).

170.    Also, since according to Ms. Eyler's dubious claim that her own Workday HR colleague Ms. Gordon is the only person responsible for the "Workday Wellness Check," Ms. Gordon, more than anyone else, has a clear conflict of interest vis-à-vis fairness and impartiality here too.

171.    It is for these reasons that once Ms. Gordon rejected his request to have a respected, senior, seemingly neutral Workday party free of any discernible conflict of interest and above reproach at the meeting[43], Plaintiff asked to "kindly … postpone" it until he could retain "legal counsel" who would "be in touch very soon."

172.    Plaintiff's "kindly"-worded question about possible postponement of the meeting was apparently a bridge too far—viewed as an insubordinate and unreasonable accommodation request by Workday—because it prompted Ms. Gordon to curtly tell Plaintiff that: (a.) "cooperating in being managed is an essential function of [his] role[;]" (b.) his request to delay the meeting until his legal counsel could be engaged was actually a "refus[al] to attend the meeting[;]" and consequently (c.) Plaintiff would "be placed on paid administrative leave effective immediately" until Plaintiff stopped his "unacceptable" "refusal to be managed by [Ms. Hauck]."

173.    Ms. Gordon told Plaintiff about his punitive (paid) administrative suspension during a March 21, 2023 Zoom conference call in which she read aloud verbatim from the email she would send to Plaintiff later that afternoon.  The meeting included another person from Workday HR who, like Ms. Gordon, Plaintiff had also never met before.

174.    Despite Workday's scant number of black employees and self-proclaimed "Black diversity problem"[44], this gentleman—who never spoke during the meeting and therefore whose presence seemed odd to Plaintiff—was also black.

---

[43] https://www.workday.com/content/dam/web/en-us/documents/investor/workday-code-of-conduct-2023.pdf..

[44] https://www.techtarget.com/searchhrsoftware/news/252485468/Workday-admits-to-Black-diversity-problem-pledges-to-improve

175.     Workday's forced placement of Plaintiff on paid administrative leave meant he was locked out of all Workday accounts, segregated from colleagues, further stripped of respect and dignity, and robbed of the basic human right to contribute or otherwise work at all in his chosen (and hard-earned) profession for an unspecified duration.

176.     Workday's retaliatory suspension and punishment of Plaintiff for the "sin" of asking (though ever politely) for a postponement to retain legal counsel, after simply asking for Ms. Fedrow to join as an honest, silent broker in a meeting with colleagues who may have committed actual crimes against him, his family, the police, and the public writ large by causing officers to go to the Hills' home (and their neighbors' homes) for no legitimate reason, and then seemingly trying to sweep the likely illegal "Workday Wellness Check" under the rug, is definitionally the creation of a hostile work environment by Workday.

177.     When Workday suddenly and **without explanation reversed itself and ended Plaintiff's paid administrative leave** about one month and one week later, while still refusing to address the circumstances underlying the so-called "Workday Wellness Check," Plaintiff's fragile health problems significantly worsened and forced him to once again use disability leave to address his myriad health challenges.

178.     Plaintiff has been on short-term disability and employer-approved medical leave since May 1, 2023.  Prior to joining Workday in early 2021, Plaintiff had never once taken disability leave at any time during his entire, two-decade legal career.

## JURISDICTION[45]

179.     This Court has jurisdiction over Workday pursuant to D.C. Code § 13-423 because Workday maintains an office and/or location at 20 F Street, 7th Floor, Washington, D.C. 20001 in which it

---

[45] On April 14, 2023, Plaintiff filed an Employment Intake Questionnaire with the District of Columbia Office of Human Rights ("OHR") against Workday.  The OHR administratively dismissed Plaintiff's complaint without deciding on the merits, allowing him to file a private cause of action in the D.C. Superior Court.  *See* D.C. Code § 2-1403.16(a).

transacts business, a substantial portion of the events giving rise to Plaintiff's claims took place in Workday's District of Columbia office, and a series of related discriminatory and retaliatory incidents that Plaintiff is alleging occurred or were "felt" in Workday's District of Columbia office.

180.     This Court has subject matter jurisdiction because Plaintiff's claims are made pursuant to D.C. Code § 11-921(a)(6).

**CLAIM I:**
**RACE AND DISABILITY DISCRIMINATION**
**IN VIOLATION OF THE DCHRA**

181.     The preceding paragraphs of this Complaint are incorporated herein.

182.     The DCHRA prohibits an employer from discriminating against an employee based on race and disability in the enjoyment of all benefits, privileges, terms, and conditions of employment.

183.     At all times relevant to this Complaint, Workday was Plaintiff's employer within the meaning of the DCHRA.

184.     At all times relevant to this Complaint, Plaintiff was an employee within the meaning of the DCHRA.

185.     At all times relevant to this Complaint, Plaintiff was a member of protected classes. Specifically, Plaintiff is black and suffers from disabilities.

186.     As detailed above, Workday, through its employees and agents, discriminated against Plaintiff by, *inter alia*, denying him promotions and equal pay; subjecting him to ongoing harassment; refusing to intervene when he was being harassed by higher-up management officials; publicly singling him out for verbal insults; refusing to provide him with adequate support and assistance for assignments; unjustifiably eliminating his supervisory duties, preventing him from working with colleagues, and otherwise interfering with conditions of his employment; sending police officers to his residence and therefore endangering his family's safety and wellbeing, and administratively suspending him for no just reason, all because of Plaintiff's race and/or disability.

187.     Workday's actions constitute discrimination in violation of the DCHRA.

188.   Workday's conduct has been intentional, deliberate, willful and in callous disregard of Plaintiff's legal rights.

189.   Workday's actions described above directly and proximately have caused, and continue to cause, Plaintiff to suffer loss of wages, loss of benefits, mental anguish, emotional distress, personal humiliation, indignity, embarrassment, inconvenience, stigma, pain and suffering, and damages to his personal and professional reputations, justifying an award including but not limited to damages for emotional distress, compensatory, punitive and consequential damages against Workday, as well as attorney's fees and costs.

190.   Given that Workday has continued to discriminate against Plaintiff despite prior complaints, clearly an award of compensatory damages will not be sufficient to bring an end to its conduct and therefore injunctive relief is necessary to finally bring an end to years of misconduct and to prevent Plaintiff from incurring irreparable harm.

## CLAIM II:
## HOSTILE WORK ENVIRONMENT
## IN VIOLATION OF THE DCHRA

191.   The preceding paragraphs of this Complaint are incorporated herein.

192.   As detailed above, Plaintiff was repeatedly subjected to unwanted harassment from Workday's management officials.  This continuing harassment has taken the form of, *inter alia*, refusal to approve a reasonable leave request, defamatory and derogatory comments, unlawful weaponization of law enforcement against a black family (which could have ended tragically), ostracization, and violation of HIPPA privacy and the D.C. Family & Medical Leave Act.

193.   This harassment occurred because of Plaintiff's race and/or disability.  This harassment has also affected the terms, conditions, and/or privileges of Plaintiff's employment at Workday insofar as it created a pervasive atmosphere of disrespect, ridicule, insult, discriminatory animus, and a threatening environment to which no employee should have to be subjected.

35

194.    Workday knew about the harassment and did not take any action to prevent it, including by refusing to discipline the perpetrators of the harassment, and refusing to promote and/or reassign Plaintiff after being informed of the harassment.

195.    Workday's actions described above directly and proximately have caused, and continue to cause, Plaintiff to suffer loss of wages, loss of benefits, mental anguish, emotional distress, personal humiliation, indignity, embarrassment, inconvenience, stigma, pain and suffering and damages to his personal and professional reputations, justifying an award including but not limited to damages for emotional distress, compensatory, punitive and consequential damages against Workday, as well as attorney's fees and costs.

196.    Given that Workday has continued to subject Plaintiff to a hostile work environment despite prior complaints, clearly an award of compensatory damages will not be sufficient to bring an end to their conduct and therefore injunctive relief is necessary to finally bring an end to years of misconduct and to prevent Plaintiff from incurring irreparable harm.

### CLAIM III:
### UNLAWFUL RETALIATION IN VIOLATION OF THE DCHRA

197.    The preceding paragraphs of this Complaint are incorporated herein.

198.    The DCHRA prohibits retaliation against any person who exercises his rights thereunder.

199.    As detailed above, Plaintiff engaged in statutorily protected activity by advocating on behalf of a black, female coworker who told Plaintiff she was being discriminated against because of her race; advocating for himself to be promoted; opposing treatment that he reasonably believed constituted unlawful discrimination, including repeatedly reporting to his supervisors and Workday HR his complaints of discrimination and the hostile work environment perpetuated by Workday employees and supervisors.

200.    As a result of this protected activity, Workday took materially adverse actions against Plaintiff as set forth above.

201.    These adverse actions included ignoring Plaintiff's requests for aid with assignments and other work-related opportunities; eliminating his supervisory duties and preventing him from working with colleagues; subjecting him to unwarranted hostile treatment and an abusive working environment; unlawfully misleading police and causing them to go to Plaintiff's home, endangering the lives and physical safety of Plaintiff's wife, children, neighbors, police officers, and other members of the community; refusing to engage in the interactive process, and denying Plaintiff promotional opportunities.

202.    These actions were such that they would dissuade a reasonable employee from making or supporting a charge of discrimination and/or hostile work environment.

203.    The failure of Workday officials, supervisors, and other leaders to respond to Plaintiff's requests for help and their contribution to the hostile work environment by ignoring Plaintiff's many complaints, together demonstrate Workday's hostility to Plaintiff's rights.

204.    Based on this persistent hostility and the timeline of events discussed herein, a clear connection exists between Plaintiff's protected activity and the adverse actions taken by Workday and their employees and agents.

205.    Workday's conduct has been intentional, deliberate, willful and in callous disregard of Plaintiff's rights.

206.    The actions of Workday and its employees and agents, including the actions described above, directly and proximately have caused, and continue to cause, Plaintiff to suffer loss of wages, loss of benefits, mental anguish, emotional distress, personal humiliation, indignity, embarrassment, inconvenience, stigma, pain and suffering and damages to his personal and professional reputations, justifying an award including but not limited to damages for emotional distress, compensatory, punitive and consequential damages against Workday, as well as attorney's fees and costs.

207.    Given that Workday has continued to retaliate against Plaintiff despite prior complaints, clearly an award of compensatory damages will not be sufficient to bring an end to their conduct and

therefore injunctive relief is necessary to finally bring an end to years of misconduct and to prevent

Plaintiff from incurring irreparable harm.

## CLAIM IV:
### FAILURE TO ENGAGE IN THE INTERACTIVE
### PROCESS IN VIOLATION OF THE DCHRA

208.    The preceding paragraphs of this Complaint are incorporated herein.

209.    As detailed above, Plaintiff has been determined by physicians and qualified medical

professionals to have impairments that substantially limit one or more of his major life activities.

210.    Namely, Plaintiff has been diagnosed with cognitive and memory issues, both of which

substantially limit one or more of his major life activities.

211.    Plaintiff was and is able to perform the essential functions of his position with reasonable

accommodations for cognitive and memory issues.

212.    Plaintiff requested accommodations consistent with the recommendations of his doctors.

These requests for accommodations were reasonable.

213.    Despite knowledge of Plaintiff's conditions, Workday refused to provide the

accommodations Plaintiff asked for that were directly related to his conditions.

## CLAIM V:
### INTERFERENCE WITH FAMILY & MEDICAL LEAVE
### IN VIOLATION OF D.C. FAMILY & MEDICAL LEAVE ACT

214.    The preceding paragraphs of this Complaint are incorporated herein.

215.    Plaintiff is an eligible employee under the D.C. Family & Medical Leave Act, D.C. Code

§ 32-501(1)(A).

216.    Plaintiff has been employed by Workday for at least 12 months.

217.    Workday is an employer in accordance with D.C. Code § 32-501(2).

218.    Workday has interfered with Plaintiff's rights established under the D.C. Code § 32-501.

38

219.    The D.C. Family & Medical Leave Act, D.C. Code § 32-503 provides eligible employees with up to 16 work weeks of medical leave during any 24-month period for a serious health condition.

220.    Because Plaintiff suffered from a physical and/or mental illness, injury, or impairment that involved inpatient care in a hospital or residential health care facility, he meets the definition for "serious health condition" pursuant to D.C. Code § 32-501(9).

221.    Workday sought to discourage, interfere with and/or deny Plaintiff's Family & Medical Leave rights by attempting to have Plaintiff attend a work meeting when it knew Plaintiff was out on approved medical leave, and misleading the Montgomery County Police Department, causing police officers to go to his home to verify that he was indeed hospitalized during Plaintiff's leave period.

222.    Further, upon information and belief, Workday violated HIPPA privacy laws and Family & Medical Leave laws by having its employees, agents, and management officials disclosing why and where Plaintiff was hospitalized.

223.    Workday's behavior in this regard was a gross interference or restraint on Plaintiff's rights under the D.C. Family & Medical Leave Act.  This behavior violated the D.C. Family & Medical Leave Act regarding interference with rights, and Plaintiff does not have to prove intent regarding this claim.

## CLAIM VI:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

224.    The preceding paragraphs of this Complaint are incorporated herein.

225.    As detailed above, Workday's actions, conducted through its employees and agents, directed at Plaintiff, have been extreme and outrageous, and included pervasive acts of discrimination, harassment, retaliation, and a hostile work environment based on Plaintiff's race and/or disability, false accusations of laziness, and the refusal of supervisors to address such behavior or assist Plaintiff with his work when help was needed, putting his job at risk.

226.   These extreme and outrageous actions resulted in humiliation and severe emotional distress to Plaintiff, causing him to undergo therapy, physical symptoms as described, and medical interventions.

227.   Such extreme and outrageous acts against Plaintiff go beyond all possible bounds of decency and are utterly intolerable in a civilized community.

228.   Workday's actions were without just cause or excuse.

229.   Plaintiff is entitled to compensatory and punitive damages in an amount to be proven at trial, as well as attorney's fees and costs because of Workday's intentional infliction of emotional distress.

## CLAIM VII:
## NEGLIGENT HIRING, SUPERVISION AND RETENTION

230.   The preceding paragraphs of this Complaint are incorporated herein.

231.   As detailed above, Workday, through its agents, selected, hired, trained, retained, assigned and supervised all members of its staff and management hierarchy, including those named above.

232.   Workday knew or should have known that the above-identified employees engaged in the illegal discrimination, harassment, hostile work environment, and retaliation against Plaintiff based on his race and/or disability and/or should have known of the numerous incidents of illegal discrimination and retaliation.

233.   Workday was negligent and careless when it selected, hired, trained, retained, assigned and supervised members of its staff including, but not limited to, those identified above.

234.   Due to this negligence, as set forth above, Plaintiff has suffered and continues to suffer physical and mental injury, pain, and trauma, together with embarrassment, humiliation, shock, and fright.

235.   Workday's negligence also directly led to many of Plaintiff's health problems, including Post Traumatic Stress Disorder, anxiety, panic attacks, and depression, resulting in inpatient

hospitalization. Plaintiff continues to suffer from these health problems attributable to Workday's treatment of him and his family.

236.     Plaintiff is entitled to compensatory and punitive damages in an amount to be proven at trial, as well as attorney's fees and costs because of Workday's negligent hiring, supervision, and retention.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court for the following relief:

237.     Enter a judgment in Plaintiff's favor against Workday for discrimination, harassment, and a hostile work environment based on his race and/or disability, for unlawful retaliation, and for the failure to engage in the interactive process in violation of the DCHRA.

238.     Permanently enjoin Workday, its officials, agents, employees, assigns, and all other persons acting in concert or participating with it from discriminating against or harassing Plaintiff based on race and/or disability, creating, maintaining, or contributing to a hostile work environment against Plaintiff, retaliating against Plaintiff, or otherwise violating the DCHRA.

239.     Enter a judgement in Plaintiff's favor against Workday for intentional infliction of emotional distress and negligent hiring, supervision, and retention in violation of D.C. common law.

240.     Enter a judgment in Plaintiff's favor against Workday for violating the D.C. Family & Medical Leave Act's prohibition against interference with authorized medical leave.

241.     Award compensatory damages in an amount to be proven at trial.

242.     Award punitive damages in an amount to be proven at trial.

243.     Award prejudgment and post-judgment interest.

244.     Award reasonable attorney's fees and costs incurred in bringing and maintaining this civil action, as allowed by law.

245.    Award past and future economic damages for all claims as allowed by law, in an amount to be determined at trial, including, but not limited to, back pay and interest on the same, front pay, and lost benefits.

246.    Award past and future non-economic damages for all claims as allowed by law, in an amount to be determined at trial, including, but not limited to, lost earnings capacity, mental suffering, emotional distress, loss of enjoyment of life, humiliation, loss of reputation, and inconvenience.

247.    Award such other and further relief as the interest of justice may require.

**JURY TRIAL REQUESTED**

Plaintiff respectfully requests a jury trial for all issues proper to be so tried.

Respectfully submitted:                                    July 24, 2023

Eden Brown Gaines
Brown Gaines, LLC
DC Bar No. 489862
Local Counsel
800 Maine Avenue SW
Suite 200
Washington, DC 20024
(202) 803-8718 (office)
(301) 542-0032 (facsimile)
egaines@browngaines.com

Roderick Cooks*
Lee Winston*
Winston Cooks, LLC
Principial Counsel
351 24th Street North
Box 122
Birmingham, AL 35203
(205) 502-0970 (office)
(205) 278-5876 (facsimile)
rcooks@winstoncooks.com
lwinston@winstoncooks.com

*Motion for Admission *pro hac vice* to be filed.

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
Civil Actions Branch
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
Telephone: (202) 879-1133 Website: www.dccourts.gov

Anthony C. Hill
_____
                              Plaintiff

                    vs.
                                                Case Number   2023-CAB-004502

Workday, Inc.
_____
                              Defendant

**SUMMONS**

To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either
personally or through an attorney, within twenty one (21) days after service of this summons upon you,
exclusive of the day of service. If you are being sued as an officer or agency of the United States Government
or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your
Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The
attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed
to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue,
N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on
Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on
the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer,
judgment by default may be entered against you for the relief demanded in the complaint.

Eden Brown Gaines                                    _Clerk of the Court_
_____
Name of Plaintiff's Attorney

800 Maine Avenue, SW, Suite 200
_____         By _____
Address                                                        Deputy Clerk
Washington, DC 20024

202-803-8718
_____         Date   7/25/2023
Telephone
如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주세요.        የአማርኛ ትርጉም ለማግኘት (202) 879-4828        ይደውሉ

        IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU
ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT
MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE
COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR
REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS
ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the
Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500
Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

                        See reverse side for Spanish translation
                        Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                Super. Ct. Civ. R. 4

# Superior Court of the District of Columbia

## CIVIL DIVISION - CIVIL ACTIONS BRANCH
## INFORMATION SHEET

Anthony C. Hill
_____
Plaintiff(s)

vs

Workday, Inc.
_____
Defendant(s)

Case Number: _____ 2023-CAB-004502 _____

Date: July 24, 2023 _____

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| **Name:** *(Please Print)*<br>Eden Brown Gaines | **Relationship to Lawsuit**<br>☑ Attorney for Plaintiff |
| **Firm Name:**<br>Brown Gaines, LLC | ☐ Self (Pro Se) |
| **Telephone No.:** (202) 803-8718   **DC Bar No.:** 489862 | ☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury     ☐ 6 Person Jury     ☑ 12 Person Jury
Demand: $ 1,000,000.00                                    Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED
Case No.:_____   Judge:_____   Calendar #:_____

Case No.:_____   Judge:_____   Calendar #:_____

---

**NATURE OF SUIT:**     *(Check One Box Only)*

**CONTRACT**
☐ Breach of Contract
☐ Breach of Warranty
☐ Condo/Homeowner Assn. Fees
☐ Contract Enforcement
☐ Negotiable Instrument

**COLLECTION/INS. SUB**
☐ Debt Collection
☐ Insurance Subrogation
☐ Motion/Application for Judgment by Confession
☐ Motion/Application Regarding Arbitration Award

**EMPLOYMENT DISPUTE**
☐ Breach of Contract
☑ Discrimination
☐ Wage Claim
☐ Whistle Blower
☐ Wrongful Termination

**REAL PROPERTY**
☐ Condo/Homeowner Assn. Foreclosure
☐ Declaratory Judgment
☐ Drug Related Nuisance Abatement

☐ Ejectment
☐ Eminent Domain
☐ Interpleader

☐ Other
☐ Quiet Title
☐ Specific Performance

☐ **FRIENDLY SUIT**
☐ **HOUSING CODE REGULATIONS**
☐ **QUI TAM**
☐ **STRUCTURED SETTLEMENTS**

**ADMINISTRATIVE PROCEEDINGS**
☐ Administrative Search Warrant
☐ App. for Entry of Jgt. Defaulted Compensation Benefits
☐ Enter Administrative Order as Judgment
☐ Libel of Information
☐ Master Meter
☐ Petition Other

☐ Release Mechanics Lien
☐ Request for Subpoena

**MALPRACTICE**
☐ Medical – Other
☐ Wrongful Death

**AGENCY APPEAL**
☐ Dangerous Animal Determination
☐ DCPS Residency Appeal
☐ Merit Personnel Act (OEA)
☐ Merit Personnel Act (OHR)
☐ Other Agency Appeal

☐ **APPLICATION FOR INTERNATIONAL FOREIGN JUDGMENT**

# Information Sheet, Continued

**CIVIL ASSET FORFEITURE**
- ☐ Currency
- ☐ Other
- ☐ Real Property
- ☐ Vehicle

**NAME CHANGE/VITAL RECORD AMENDMENT**
- ☐ Birth Certificate Amendment
- ☐ Death Certificate Amendment
- ☐ Gender Amendment
- ☐ Name Change

**TORT**
- ☐ Abuse of Process
- ☐ Assault/Battery
- ☐ Conversion
- ☐ False Arrest/Malicious Prosecution
- ☐ Libel/Slander/Defamation
- ☐ Personal Injury
- ☐ Toxic Mass
- ☐ Wrongful Death (Non-Medical Malpractice)

**GENERAL CIVIL**
- ☐ Accounting
- ☐ Deceit (Misrepresentation)
- ☐ Fraud
- ☐ Invasion of Privacy
- ☐ Lead Paint
- ☐ Legal Malpractice
- ☐ Motion/Application Regarding Arbitration Award
- ☐ Other - General Civil

- ☐ Product Liability
- ☐ Request for Liquidation
- ☐ Writ of Replevin
- ☐ Wrongful Eviction

**CIVIL I/COMPLEX CIVIL**
- ☐ Asbestos

**MORTGAGE FORECLOSURE**
- ☐ Non-Residential
- ☐ Residential

**STATUTORY CLAIM**
- ☐ Anti – SLAPP
- ☐ Consumer Protection Act
- ☐ Exploitation of Vulnerable Adult
- ☐ Freedom of Information Act (FOIA)
- ☐ Other

**TAX SALE FORECLOSURE**
- ☐ Tax Sale Annual
- ☐ Tax Sale Bid Off

**VEHICLE**
- ☐ Personal Injury
- ☐ Property Damage

- ☐ **TRAFFIC ADJUDICATION APPEAL**
- ☐ **REQUEST FOR FOREIGN JUDGMENT**

_____
Filer/Attorney's Signature

July 24, 2023
_____
Date



**Superior Court of the District of Columbia**
**Civil - Civil Actions Branch**
**500 Indiana Ave NW, Room 5000, Washington DC 20001**
**(202) 879-1133 | www.dccourts.gov**

**Case Number:** 2023-CAB-004502

**Case Caption:** Anthony C Hill v. Workday, Inc.

## INITIAL ORDER

| Initial Hearing Date: | Initial Hearing Time: | Courtroom Location: |
|---|---|---|
| Friday, 10/27/2023 | 9:30 AM | Remote Courtroom 318 |
| **Please see attached instructions for remote participation.** | | |
| Your case is assigned to Associate Judge Milton C Lee. | | |

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby ORDERED as follows:

1) This case is assigned to the judge and calendar designated above. All future filings in this case shall bear the calendar number and judge's name along with the case number in the caption.

2) Within 60 days of the filing of the complaint, plaintiff must file proof of service on each defendant of copies of the summons, the complaint, and this Initial Order. The court will dismiss the claims against any defendant for whom such proof of service has not been filed by this deadline, unless the court extended the time for service under Rule 4.

3) Within 21 days of service (unless otherwise provided in Rule 12), each defendant must respond to the complaint by filing an answer or other responsive pleading. The court may enter a default and a default judgment against any defendant who does not meet this deadline, unless the court extended the deadline under Rule 55(a).

4) At the time stated below, all counsel and unrepresented parties shall participate in a hearing to establish a schedule and discuss the possibilities of settlement. Counsel shall discuss with their clients before the hearing whether the clients are agreeable to binding or non-binding arbitration. This order is the only notice that parties and counsel will receive concerning this hearing.

5) If the date or time is inconvenient for any party or counsel, the Civil Actions Branch may continue the Conference once, with the consent of all parties, to either of the two succeeding days when the calendar is called. To reschedule the hearing, a party or lawyer may call the Branch at (202) 879-1133. Any such request must be made at least seven business days before the scheduled date. No other continuance will be granted except upon motion for good cause shown.

6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order.  Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Anita M. Josey-Herring

**To Join by Computer, Tablet, or Smartphone:**

1) Copy and Paste or Type the link into a web browser and enter the Webex Meeting ID listed below.

   Link: dccourts.webex.com/meet/ctb318

   Meeting ID: 129 801 7169

2) When you are ready, click "Join Meeting".
3) You will be placed in the lobby until the courtroom clerk gives you access to the hearing.


**Or to Join by Phone:**

1) Call 202-860-2110 (local) or 844-992-4726 (toll-free)
2) Enter the Webex Meeting ID listed above followed by "##"


**Resources and Contact Information:**

1) For best practices on how to participate in Webex Meetings, click here https://www.webex.com/learn/best-practices.html.
2) For technical issues or questions, call the Information Technology Division at 202-879-1928 and select option 2.
3) For case questions, call the Civil Actions Branch Clerk's Office at (202) 879-1133.

## ACCESSIBILITY AND LANGUAGE ACCESS

**Persons with Disabilities:**

If you have a disability as defined by the American Disabilities Act (ADA) and you require an accommodation, please call 202-879-1700 or email ADACoordinator@dcsc.gov . The D.C. Courts does not provide transportation service.

**Interpreting and Translation Services:**

The D.C. Courts offers free language access services to people having business with the court who are deaf or who are non-English speakers. Parties to a case may request free translations of court orders and other court documents. To ask for an interpreter or translation, please contact the Clerk's Office listed for your case. For more information, visit https://www.dccourts.gov/language-access.

**Servicios de interpretación y traducción:**

Los Tribunales del Distrito de Columbia ofrecen servicios gratuitos de acceso al idioma a las personas sordas o que no hablan inglés que tienen asuntos que atender en el tribunal. Las partes de un caso pueden solicitar traducciones gratuitas de las órdenes judiciales y otros documentos del tribunal. Para solicitar un intérprete o una traducción, póngase en contacto con la Secretaría de su caso.

Para más información, visite https://www.dccourts.gov/language-access.

El acceso al idioma es importante para los Tribunales del Distrito de Columbia. Puede dar su opinión sobre los servicios de idiomas visitando https://www.dccourts.gov/services/information-and-resources/interpreting-services#language-access.

**የቃልና የጽሑፍ ትርጓሜ አገልግሎቶች:**

የዲ.ሲ. ፍርድ ቤቶች መስማት ለተሳናቸውና የእንግሊዝኛ ቋንቋ ተናጋሪ ላልሆኑ በፍርድ ቤቱ ጉዳይ ላላቸው ሰዎች ነጻ የቋንቋ ተደራሽነት አገልግሎቶች ያቀርባል። ተከራካሪ ወገኖች የፍርድ ቤት ትእዛዞችና ሌሎች የፍርድ ቤት ሰነዶች በነጻ እንዲተረጎሙላቸው መጠየቅ ይችላሉ። የቃል ወይም የጽሑፍ ትርጓሜ ለመጠየቅ እባክዎን በመዝገብዎ የተዘረዘሩትን የጸሀፊ ቢሮ (ክለርክ'ስ አፊስ) ያናግሩ። ለተጨማሪ መረጃ https://www.dccourts.gov/language-access ይጎብኙ።

የቋንቋ ተደራሽነት ለዲ.ሲ. ፍርድ ቤቶች አስፈላጊ ነው። የቋንቋ አገልግሎቶች በተመለከተ አስተያያትዎን https://www.dccourts.gov/services/information-and-resources/interpreting-services#language-access በመጎብኘት መስጠት ይችላሉ።

# Tips for Attending Remote Hearings - Civil Division

*Your court hearing may be held remotely. This means that you will participate by phone or by video conference instead of coming to the courthouse. Here are some tips on how to prepare.*

## How do I know if I have a remote hearing?

The Court will contact you to tell you that your hearing is remote. They may contact you by sending you an email, letter in the mail, or by calling you.

## How do I take part in a remote hearing?

The Court will give you step-by-step instructions on how to take part in the remote hearing.

If you lose your written notice, call the Civil Actions Clerk's Office for instructions at:

📞 202-879-1133

## Is there anything that I should do before the day of the hearing?

- Let the court know immediately if you cannot join a hearing because you do not have a phone or computer.

  📞 Civil Actions Clerk's Office: 202-879-1133

- You may want to contact an attorney for legal help.

- You can also find the list of legal services providers at dccourts.gov/coronavirus by clicking on the link that says, "List of Legal Service Providers for Those Without an Attorney."

- Evidence: if you want the judge to review photos or documents, ask the judge how to submit your evidence.

- Witnesses: tell the judge if you want a witness to testify at your hearing.

- Accommodations & Language Access: let the court know if you need an interpreter or other accommodation for your hearing.

## Tips for the Hearing



- Join the hearing a few minutes early!

- Charge your computer or phone and make sure you have enough minutes to join the call. Find a private and quiet space. If possible, be alone in a room during the hearing. Try to limit distractions as much as possible. If others are in the room with you, ask if they can be quiet during the hearing.

- Mute your microphone when you are not talking. Mute all sounds on your phone or computer.

- Say your name before you speak so the record is clear. Be prepared to identify your role in the hearing (e.g., observer, plaintiff, defendant, witness, etc.).

- Speak slowly and clearly so everyone hears what you are saying.

- Pause before speaking in case there is a lag. Use a headset or headphones if you can. This will free up your hands and sound better.

- Try not to talk over anyone else. Only one person can speak at a time. If you talk while someone else is talking, the judge will not be able to hear you.

- Have all your documents for the hearing in front of you. Have a pen and paper to take notes.

- If you are not ready for your hearing or want to speak with an attorney, you can ask the judge to postpone your hearing for another date.

- If your sound or video freezes during the hearing, use the chat feature or call the Clerk's Office to let them know that you are having technical issues.

## Special Tips for Video Hearings (Click here for more information)



- Download the court's hearing software, WebEx, in advance and do a test run! The Court will provide you with a WebEx link in advance of the hearing.

- Set up the camera at eye level. If you are using your phone, prop it up so you can look at it without holding it.

- Look at the camera when you speak and avoid moving around on the video.

- Wear what you would normally wear to court.

- Sit in a well-lit room with no bright lights behind you.

- If possible, find a blank wall to sit in front of. Remember the judge will be able to see everything on your screen, so pick a location that is not distracting.




# District of Columbia Courts

# Tips for Using DC Courts Remote

The DC Courts have **remote hearing sites** available in various locations in the community to help persons who may not have computer devices or internet service at home to participate in scheduled remote hearings.  The Courts are committed to enhancing access to justice for all.

There are six remote access sites throughout the community which will operate: **Monday – Friday, 8:30 am – 4:00 pm.**

**The remote site locations are:**



| **Remote Site - 1** | **Remote Site - 4** |
|---|---|
| Balance and Restorative Justice Center<br>1215 South Capitol Street, SW<br>Washington, DC 20003 | Balance and Restorative Justice Center<br>920 Rhode Island Avenue, NE<br>Washington, DC 20018 |
| **Remote Site - 2**<br>Balance and Restorative Justice Center<br>1110 V Street, SE<br>Washington, DC 20020 | **Remote Site - 5**<br>Reeves Center<br>2000 14th Street, NW, 2nd Floor<br>Community Room<br>Washington, DC 20009 |
| **Remote Site - 3**<br>Balance and Restorative Justice Center<br>118 Q Street, NE<br>Washington, DC 20002 | **Remote Site - 6**<br>Reeves Center<br>2000 14th Street, NW, Suite 300N<br>Office of the Tenant Advocate<br>Washington, DC 20009<br>*** No walk-ins at this location*** |

If you want to use a remote site location for your hearing, call **202-879-1900** or email DCCourtsRemoteSites@dcsc.gov **at least 24 hours before your hearing to reserve a remote access computer station**.  If you require special accommodations such as an interpreter for your hearing, please call **202-879-1900 at least 24 hours in advance of your hearing so the Courts can make arrangements**.

**\*You should bring the following items when you come to your scheduled site location\***

1. Your **case number** and any **hyperlinks** provided by the Courts for your scheduled hearing.
2. Any documents you need for the hearing (evidence), including exhibits, receipts, photos, contracts, etc.
3. Materials for notetaking, including pen and paper.

**\*Safety and security measures are in place at the remote sites.\***

**Contact information to schedule your remote access computer station:**
Call: **202-879-1900**
Email:  DCCourtsRemoteSites@dcsc.gov



# Tribunales del Distrito de Columbia
## Consejos para usar los sitios de audiencia remota de los Tribunales de DC



Los Tribunales de DC disponen de **sitios de audiencia remota** en distintos centros de la comunidad para ayudar a que las personas que no tienen dispositivos informáticos o servicio de Internet en su casa puedan participar en audiencias remotas programadas. Los Tribunales honran el compromiso de mejorar el acceso de toda la población a la justicia.

En toda la comunidad hay seis sitios de acceso remoto que funcionarán de **lunes a viernes, de 8:30 am a 4:00 pm**.

Los centros de acceso remoto son:

### Sitio Remoto - 1
Balance and Restorative Justice Center
1215 South Capitol Street, SW
Washington, DC 20003

### Sitio Remoto - 2
Balance and Restorative Justice Center
1110 V Street, SE
Washington, DC 20020

### Sitio Remoto - 3
Balance and Restorative Justice Center
118 Q Street, NE
Washington, DC 20002



### Sitio Remoto - 4
Balance and Restorative Justice Center
920 Rhode Island Avenue, NE
Washington, DC 20018

### Sitio Remoto - 5
Reeves Center
2000 14th Street, NW, 2nd Floor
Community Room
Washington, DC 20009

### Sitio Remoto - 6
Reeves Center
2000 14th Street, NW, Suite 300N
Office of the Tenant Advocate
Washington, DC 20009
*No se puede entrar sin cita previa*

Si desea usar un sitio remoto para su audiencia, llame al **202-879-1900** o envíe un mensaje de correo electrónico a DCCourtsRemoteSites@dcsc.gov **al menos 24 horas antes de la audiencia, para reservar una estación de computadora de acceso remoto.** Si necesita adaptaciones especiales, como un intérprete para la audiencia, llame al **202-879-1900 al menos 24 horas antes de la audiencia para que los Tribunales puedan hacer los arreglos necesarios.**

**\*Cuando concurra al sitio programado debe llevar los siguientes artículos\***

1. Su **número de caso** y todos los **hipervínculos** que le hayan proporcionado los Tribunales para la audiencia programada.

2. Cualquier documento que necesite para la audiencia (prueba), incluidos documentos probatorios, recibos, fotos, contratos, etc.

3. Materiales para tomar nota, como papel y lápiz.

**\*Los sitios de acceso remoto cuentan con medidas de seguridad y protección.**

**Información de contacto para programar su estación de computadora de acceso remoto:**
Teléfono: **202-879-1900**
Correo electrónico: DCCourtsRemoteSites@dcsc.gov

eFiled
08/14/2023 12:32:22 PM
Superior Court
of the District of Columbia

IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA

Anthony C. Hill                          :
    Plaintiff,                          :
                                        :
v.                                       :    Civil Action No.
                                        :    2023-CAB-004502
Workday, Inc.                            :
    Defendant.                          :

## DECLARATION OF SERVICE

My name is Katie Franklin, I am over the age of majority and I make this declaration based on facts known personally to me.

    1.     I am employed with the firm of Brown Gaines, LLC as a paralegal. The firm represents the Plaintiff in the above-styled matter.

    2.     I caused a copy of the Summons, Complaint, Initial Order and Hearing Notice in the above-styled matter to be served via United States Postal Service Certified Mail on Workday, Inc. via their registered agent, CT Corporation System, 1015 15th Street, NW, Suite 1000, Washington, DC 20005. As evidenced by the receipt attached hereto as Exhibit 1, process was effectuated on July 27, 2023.

I declare under penalty of perjury that the foregoing statements are true and accurate to the best of my knowledge.

*Katie Franklin*                          August 14, 2023
_____                   _____
Katie Franklin                            Date

EXHIBIT 1

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Workday, Inc.
c/o CT Corporation System
1015 15th Street, NW
Suite 1000
Washington, DC 20005

9590 9402

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☐ Agent
☐ Addressee

B. Received by (Printed Name)          C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature

☐ Priority Mail Express®
Mail™
il Restricted
for

☐ Signature Confirmation™
☐ Signature Confirmation
Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt

IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA

Anthony C. Hill                :
     Plaintiff,             :
                               :
v.                          :     Civil Action No.
                               :     2023-CAB-004502
Workday, Inc.            :
     Defendant.         :

## MOTION FOR ADMISSION PRO HAC VICE

I, Eden Brown Gaines, hereby move for the admission of Roderick Twain Cooks, of

Winston Cooks, LLC at 420 20th Street North, Suite 2200, Birmingham, AL 35203, *pro hac*

*vice*, for the purpose of acting as co-counsel for Plaintiff, Anthony C. Hill in this above-styled

case.  The required application has been filed and a copy is attached as Exhibit 1.


Respectfully submitted:                     August 14, 2023


Eden Brown Gaines (DC Bar No. 489862)
Brown Gaines, LLC
800 Maine Avenue, SW
Suite 200
Washington, DC 20024
(202) 803-8718 (office)
(301) 542-0032 (facsimile)
egaines@browngaines.com

### CERTIFICATE OF SERVICE

The undersigned attorney here certifies that on August 14, 2023, a true and correct copy of the foregoing document was forwarded by first class mail to:

Workday, Inc.*
% CT Corporation System
1015 15th Street, NW
Suite 1000
Washington, DC 20005

*Defendant has not yet entered an appearance.

Eden Brown Gaines

2

IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA

Anthony C. Hill                          :
      Plaintiff,                   :
                                   :
v.                                       :      Civil Action No.
                                   :      2023-CAB-004502
Workday, Inc.                            :
      Defendant.                   :

## **PROPOSED ORDER**

     HAVING CONSIDERED the Motion for Admission Pro Hac Vice, filed on behalf of

Roderick Twain Cooks, the applicant, out-of-state attorney, and hearing no opposition from

Defendants, and finding good and just cause, it is HEREBY ORDERED this ____ day of

August, 2023, that the Motion shall be GRANTED.


_____
Superior Court Judge

DC Bar Admissions Print Application Forms    EXHIBIT 1

# Pro Hac Vice Application

**Application Submitted on 08.01.2023**

**Form 8 - Application for Admission Pro Hac Vice**

**Form 8 - Application for Admission Pro Hac Vice**

| | |
|---|---|
| Plaintiff(s)/Appellant(s) | Anthony C. Hill |
| Defendant(s)/Appellee(s) | Workday, Inc. |
| Case No | 2023-CAB-004502 |
| Full Legal Name | Roderick Twain Cooks |
| Address 1 | 420 20th Street North |
| Address 2 | Suite 2200 |
| City | Birmingham |
| State/Province | Alabama |
| Postal Code | 35203 |
| Country | United States of America |
| Phone Number | (205) 502-0970 |
| Email | rcooks@winstoncooks.com |

I am "admitted" (as defined in Rule 49(b)(7) of the Rules of the District of Columbia Court of Appeals) in the following United States jurisdictions or territories (or those listed on a Word document to supplement this form.

| | |
|---|---|
| State Territory | AL |
| Bar Number | 581978R |

Check one

No disciplinary complaints are pending against me; or <----> All pending disciplinary complaints against me are described in an attachment hereto.

Check one

I have never been denied admission to the District of Columbia Bar; or <----> Any denial of my admission to the District of Columbia Bar is described in an attachment hereto.

The following D.C. Bar Member has agreed to "supervise" (as defined in Rule 49(b)(9) of the Rules of the District of Columbia Court of Appeals) my practice in this case:

| | |
|---|---|
| Name | Eden Brown-Gaines |
| D.C Bar Number | 489862 |

DC Bar Admissions Print Application Forms                    EXHIBIT 1

| | |
|---|---|
| Phone | (202) 803-8718 |
| Email | egaines@browngaines.com |
| Address 1 | 800 Maine Avenue SW |
| Address 2 | Suite 200 |
| City | Washington |
| State | DC |
| ZIP Code | 20024 |
| Province | |
| Country | United States of America |

Check one

I do not practice law in the District of Columbia or hold out as authorized to do so other than in this case; or <----> One or more of Rules 49(c)(1) (12) of the Rules of the District of Columbia Court of Appeals authorize all aspects of my practicing law in the District of Columbia or holding out as authorized to do so for the reasons explained in an attachment.

Check one

I have not applied for admission pro hac vice in 5 or more proceedings (excluding pro bono proceedings) in the courts of the District of Columbia in the prior 365 days; or <----> I have applied for admission pro hac vice in 5 or more proceedings (excluding pro bono proceedings) in the courts of the District of Columbia in the prior 365 days. I have explained in an attachment the grounds that constitute good cause for my admission pro hac vice in this case notwithstanding Rule 49(c)(7)(A)(v) of the Rules of the District of Columbia Court of Appeals.

Check one

I am applying for admission pro hac vice in the District of Columbia Court of Appeals, and I have read the Rules of that Court; or <----> I am applying for admission pro hac vice in a division of the Superior Court of the District of Columbia, and I have read Rule 49(c)(7) of the Rules of the District of Columbia Court of Appeals and the rules of the Superior Court division in which this case is pending

| | |
|---|---|
| I acknowledge the power and jurisdiction of the courts of the District of Columbia over my conduct in or concerning this case. | Yes |
| I agree to abide by the District of Columbia Rules of Professional Conduct in this case if I am admitted pro hac vice. | Yes |
| I agree to notify the court promptly if, during the case, I am suspended or disbarred for disciplinary reasons or resign with charges pending in any jurisdiction or court. | Yes |

Check one

I will register for electronic filing and service in this case using the District of Columbia Court of Appeals eFiling system within seven (7) days of my being admitted pro hac vice. <----> I will register for electronic filing and service in this case using the Superior Court of the District of Columbia eFiling system within seven (7) days of my being admitted pro hac vice unless an exception to the e-filing requirement applies.

I state under penalty of perjury that the foregoing is true. Type your name in the box to sign electronically:          Roderick T. Cooks

**Signed on this date: 08/01/2023 10:57:04**